UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.: 1:08cr00057-016 |
| v. | ) | (BJR) |
| | ) | |
| AURELIO CANO-FLORES, | ) | |
| a.k.a "Yankee," a.k.a. "Yeyo," | ) | Sentencing Date: |
| | ) | May 13, 2013 |
| Defendant. | ) | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, through undersigned counsel, and in accord with 18 U.S.C.

§ 3553(a) and the United States Sentencing Commission, *Guidelines Manual,* § 6A1.2 (Nov.

2012), files this Memorandum in Aid of Sentencing.  The Government submits that a sentence of

life imprisonment is sufficient but not greater than necessary to comply with the purposes of 18

U.S.C. § 3553(a).

## I.    FACTUAL BACKGROUND

Agents with the Drug Enforcement Administration ("DEA") conducted a long-term

investigation into the drug trafficking activities of the Gulf Cartel (hereinafter "Cartel").  The

Cartel and former members of the Mexican Special Forces, who came to call themselves Los

Zetas, joined together in approximately 2000. The Cartel and Los Zetas are sometimes referred to

as "The Company."

During the investigation, the Government requested and obtained court authorization to

intercept over 100 target telephones, which produced tens of thousands of pertinent calls between

members of the Cartel.  The wiretap intercepts and testimony from cooperating witnesses, used to

contextualize the intercepts and provide testimonial evidence regarding Defendant's illegal

activities, was the primary evidence against Defendant at trial.

The evidence produced at trial established that during the period charged in the Indictment, the Cartel controlled hundreds of miles of territory near the Mexican border with Texas and moved tons of marijuana and cocaine into the United States via the "Plazas," or towns, that they controlled, including Miguel Aleman, Los Guerra, Reynosa, and Matamoros, among others.  The Cartel also "taxed," that is, collected a fee, from other traffickers who shipped illegal narcotics across the border into Texas from within their territory.

The trial testimony and evidence also established that Defendant began working for the Cartel while he was a police officer in Mexico.  Defendant eventually worked his way up the ranks and ultimately became the Cartel's Plaza Commander/Plaza Boss in a border area called Los Guerra.

## II.   <u>PROCEDURAL BACKGROUND</u>

On March 13, 2008, a grand jury sitting in the United States District Court for the District of Columbia returned a three-count sealed Indictment, Cr. 08-057, charging eleven defendants with conspiracy to possess with intent to import cocaine and marijuana into the United States, and two substantive counts of possession with intent to import cocaine into the United States, all in violation of 21 U.S.C. §§ 959, 960, 963, and 18 U.S.C. § 2.  The Indictment was brought against four leaders and seven of the top lieutenants of the Mexican Gulf Cartel.

On June 9, 2009, a grand jury sitting in the United States District Court for the District of Columbia returned a three-count unsealed Superseding Indictment in case 08-057 charging nineteen defendants with conspiracy to manufacture and distribute both cocaine and marijuana for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959, 960, and 963.  Ten of the nineteen defendants were charged with the substantive count of possession of cocaine for importation, in violation of 21 U.S.C. § 959, based on a seizure of cocaine in Tampico, Mexico.

2

Four of the nineteen defendants were charged in count three, with the same offense as in count two, based upon a seizure of cocaine in Colon, Panama.

On November 4, 2010, a grand jury sitting in the United States District Court for the District of Columbia returned a Second Superseding Indictment in 08-057, which differs from the previous in that it added defendant Daniel Perez-Rojas.

On September 6, 2012, in connection with preparation for the trial of Aurelio Cano Flores, a grand jury sitting in the United States District Court for the District of Columbia returned a Third Superseding Indictment in 08-057, which differs from the previous in that it amended the start date of the conspiracy to 2000 and corrected a scrivener's error in the allegations of overt acts.  Defendant was tried and convicted pursuant to this Third Superseding Indictment.

### III.   <u>ARGUMENT</u>

The PSR calculated Defendant's Total Offense Level as a 43 and his Criminal History Category as I. Based on those calculations, Defendant's applicable Guideline range is life. While the statutory minimum for this offense is ten years, life imprisonment is the appropriate sentence for Defendant due to the massive quantity of narcotics he and his coconspirators imported into the United States, the possession and use of weapons by Cartel members, Defendant's abuse of a position of public trust, Defendant's leadership role within the Cartel, Defendant's direct involvement in the importation of narcotics into the United States, and the 18 U.S.C. § 3553 factors described herein.

Under the Sentencing Reform Act, as interpreted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the district courts follow a two-step process when imposing a sentencing on a defendant.  First, the Court must properly calculate and consider the defendant's applicable Sentencing Guideline range.  *Booker*, 543 U.S. at 245; *United States v.*

*Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005); *United States v. Ventura*, 481 F.3d 821, 823 (D.C. Cir. 2007). The Sentencing Guidelines "should be a starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The Sentencing Guidelines are advisory, not mandatory. *United States v. Motley*, 587 F.3d 1153, 1158 (D.C. Cir. 2009) ("In *Booker*, the Supreme Court excised the statutory section that had made the Guidelines mandatory, thus rendering them advisory."); *United States v. Dorcely,* 454 F.3d , 366, 375 (D.C. Cir. 2006) ("In a post-*Booker* world, the [sentencing] court must calculate and consider the applicable Guidelines range but is not bound by it.").

In the second step, the Court must "tailor the sentencing in light of other statutory factors as well." *Booker*, 543 U.S. at 245; *Coumaris*, 399 F.3d at 351. Those statutory factors include those set forth in 18 U.S.C. § 3553(a). The first factor requires the court to consider the nature and circumstance of the offense and the defendant. 18 U.S.C. § 3553(a)(1). The second factor requires the court to consider the general principles of sentencing — the need for the defendant's sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correction treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). The third factor pertains to types of sentences available; the fourth factor pertains to the Sentencing Guidelines; and the fifth factor pertains to relevant policy statements issued by the Sentencing Commission. *Gall*, 552 U.S. at 49-50 n.6 (citing 18 U.S.C. § 3553(a)(3)-(5)). The sixth factor requires the court to avoid unwarranted sentencing disparities between similarly situated defendants. 18 U.S.C. § 3553(a)(6). The seventh factor pertains to restitution to victims. 18 U.S.C. § 3553(a)(7).

The District Court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50 (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)).  Instead, the Court at sentencing must make an "individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  In *Motley*, the D.C. Circuit noted that "most (but not all) circuits have held that calculating the Guidelines sentence includes taking into account any traditional Guidelines-based departure."  *Motley*, 587 F.3d at 1158; *see also, e.g., United States v. Vazquez-Lebron*, 582 F.3d 443, 445 (3d Cir. 2009) (requiring sentencing court to calculate Guideline range, state on the record whether any departure was being granted and, if so, how such departure affects Guideline calculation, and then exercise discretion by considering § 3553(a) factors when imposing final sentence).

## A.  Defendant's Sentencing Guidelines Range is Correctly Calculated in the Presentence Investigation Report.

According to the PSR, Defendant's Total Offense Level is 43 and his Criminal History is I, resulting in a Guideline range of life.  PSR ¶¶ 152, 156, filed April 8, 2013.  The Probation Officer calculated a Base Offense Level of 38, based on drug quantities, pursuant to USSG § 2D1.1(a)(5) and (c)(1). PSR ¶ 141. The Probation Officer then found Defendant accountable for 2,000 pounds of marijuana and 150 kilograms of cocaine, noting that the facts of the case support a finding that Defendant was responsible for additional quantities. PSR ¶ 141 n.4. The Probation Officer applied a two-level enhancement because a dangerous weapon was possessed in connection with the conspiracy.  PSR ¶ 142. The Probation Officer also determined that Defendant's conduct supported an Aggravating Role Adjustment and assessed a two-level enhancement, due to his direct involvement in the importation of narcotics. PSR ¶ 144. The Probation Officer next applied a two-level enhancement for Defendant's abuse of a public trust.

PSR ¶ 146.  Additionally, the Probation Officer determined Defendant's role as a manager or

supervisor warranted a three-level enhancement. PSR ¶ 147. The Probation Officer found that

Defendant was not eligible for an acceptance of responsibility reduction. PSR ¶ 151. The

Probation Officer adjusted the Offense Level from 47 to 43 to reflect the limits of the Sentencing

Table. PSR ¶ 152. Finally, the Probation Officer determined that Defendant's lack of a criminal

record placed him in Criminal History Category I.  PSR ¶¶ 155, 156.  Thus, the Probation Officer

determined Defendant's Sentencing Guideline range is life.  The Government agrees that this is

the appropriate starting point for the sentencing analysis under *Booker* and *Gall*.

> ### 1.        Defendant's Base Offense Level is Correctly Calculated at 38.

Pursuant to USSG § 2D1.1(a)(5) and (c)(1), the Base Offense Level for conspiring to

manufacture and distribute 150 kilograms or more of cocaine or 30,000 kilograms or more of

marijuana for importation into the United States is 38.  The evidence presented at trial established

that Defendant and his coconspirators regularly distributed ton quantities of both cocaine and

marijuana for importation into the United States. As such, the PSR correctly determined that

Level 38 is the starting point, although Defendant is certainly responsible for far more than the

amounts represented by the Guidelines. Defendant in fact concedes that the appropriate Base

Offense Level based on the trial evidence in this case is 38.

> ### 2.        The Application of the Dangerous Weapon Enhancement is
> ### Appropriate.

Pursuant to USSG § 2D1.1(b)(1), a two-level enhancement is applicable if a dangerous

weapon is possessed unless it is clearly improbable that the weapon was connected to the offense.

The Government will present evidence at sentencing that Defendant personally possessed

firearms during and in connection with the conspiracy. However, through the evidence introduced

at trial, including intercepted calls and witness testimony, the Government has already established that members of the conspiracy regularly possessed and used weapons during the time Defendant was a member of the conspiracy, and that the possession and use of weapons was reasonably foreseeable to all Cartel members, including Defendant, given the violent nature of the Cartel.

Defendant contests the application of this enhancement because no direct evidence was presented at trial that he personally possessed a dangerous weapon. Further, Defendant contends that to the extent the Government relies on his position as a police officer, his possession of a firearm would have been legal.[1] Defendant's argument is misplaced.

Courts have held that this enhancement is appropriate when a dangerous weapon is possessed by a coconspirator and where it is reasonably foreseeable that the defendant knew dangerous weapons were used in furtherance of the conspiracy. *United States v. Souffront*, 338 F.3d 809, 832-33 (7th Cir. 2009) (holding that the district court did not err in concluding that the two-level enhancement was appropriate because the defendant was the leader of the Latin Kings and a firearm was found at the defendant's street-boss's apartment, the defendant ordered violence against the street-boss, and there was testimony at trial regarding the gang's use of violence as a means of discipline and security); *United States v. Trammell*, 220 Fed. App'x. 945, 947 (11th Cir. 2007) (holding that the enhancement was appropriate where the government proved by a preponderance of the evidence that the possessor of the firearm was a coconspirator, the possession was in furtherance of the conspiracy, the defendant was a member of the conspiracy at the time of possession, and the possession was reasonably foreseeable to the

---

[1] The Fifth Circuit held that illegality of the weapon is inconsequential. The determining factor is if it was used in furtherance of the conspiracy. *United States v. Otero*, 868 F.2d 1412, 1415 (5th Cir. 1989). Witness testimony provided that Defendant was a police officer and as a police officer he guarded loads of the Cartel's narcotics. (Trial Tr. A.M. Session, 39-43, Feb. 19, 2013; Trial Tr. P.M. Session, 47-54, Feb. 20, 2013.)

7

defendant); *United States v. Batista*, 684 F.3d 333, 343-44 (2d Cir. 2012) ("Although a physical

nexus between the defendant and the firearm is often useful in determining possession, such a

nexus is by no means required in order for a court to impose the enhancement. Rather, courts

should determine whether, by a preponderance of the evidence — including evidence relating to a

defendant's specialized knowledge regarding the activities of drug gangs — possession of a

firearm in connection with the offense was reasonably foreseeable by the defendant."); *United*

*States v. Ortiz-Torres*, 449 F.3d 61, 77-78 (1st Cir. 2006) (holding that the district court did not

err in concluding that the possession of firearms was reasonably foreseeable to the defendant

where the agent testified that weapons were commonly used and he had seen weapons seized

from members of the conspiracy and an unindicted coconspirator testified that members of the

conspiracy were always armed during drug deals and had personally seen the defendant with a

firearm).

    Ample testimony was presented at trial regarding the Cartel's possession and use of

weapons throughout the entire time of the conspiracy. Jesus Enrique Rejon Aguilar testified about

various weapons and violent acts committed by Cartel memberd, including multiple killings he

and others committed on behalf of the Cartel. (Trial Tr. vol. 2, 83, Feb. 12, 2013; Trial Tr. A.M.

session, 28, Feb. 13, 2013.) Mr. Rejon Aguilar also testified that Los Zetas had access to M-16s,

grenades, rocket launchers, and a host of other dangerous weapons. (Trial Tr. vol. 3, 13-16, Feb.

13, 2013.)

    The jury also heard intercepted phone calls between Cartel members discussing weapons

and acts of violence. In one recorded call from March 7, 2007, Mr. Rejon Aguilar and Samuel

Flores Borrego, a close associate of Defendant, discuss a 5.7 caliber weapon that was modified to

fire in automatic mode. (Trial Tr. vol. 3, 35-36, Feb. 13, 2013.) Witness testimony and multiple

intercepted phone calls showed that Defendant was a member of the conspiracy at that time. For example, the Government introduced a call from February 13, 2007 between Defendant and Mr. Flores Borrego where the two discussed kilos. (Government Ex. 3.31.) Then on March 10, 2007, Defendant is again recorded speaking to coconspirators, including Juan Reyes Mejia Gonzalez, about narcotics. (Government Ex. 3.33; 3.34; 3.35.)

Also presented at trial were two phone calls between Defendant and Mr. Flores Borrego where the two discussed having a "snitch" killed. (Government Ex. 3.21; 3.22.) Mr. Rejon Aguilar explained that according to these calls, an assassin was going to be sent to kill the "snitch" so Defendant did not have to do it himself. (Trial Tr. vol. 4, 94-98, Feb. 14, 2013.)  In one of the calls, Mr. Flores Borrego told Defendant they would "eat him raw." (Government Ex. 3.22.) Mr. Rejon Aguilar testified that Mr. Flores Borrego meant the suspected "snitch" would be killed soon. Several times throughout the call, Defendant responded with "órale," or "alright," to the planned murder as explained by Mr. Flores Borrego.

Defendant suggests that these calls do not prove that Defendant possessed a dangerous weapon. Defendant is correct. But Government Exhibit 3.21 and 3.22 do establish that members of the Cartel used weapons and associated acts of violence in furtherance of the conspiracy, and that Defendant was fully aware of it. Also, Mr. Rejon Aguilar testified that Defendant was the Plaza Boss of Los Guerra. According to Mr. Rejon Aguilar, a Plaza Boss was responsible for all personnel including the "sicarios" or assassins.  (Trial Tr. A.M. Session, 34-35, Feb. 14, 2013.) It is beyond the stretch of the imagination that Cartel assassins would not use dangerous weapons to commit this murder or that Defendant would not have foreseen the use of weapons to commit this killing for Defendant's direct and indirect benefit.

9

Through trial testimony, it is evident that dangerous weapons were possessed by coconspirators. Further, possession and use of dangerous weapons by members of the conspiracy was in furtherance of the conspiracy — to maintain order within the organization, to protect drugs during transport, to end disputes over drug routes and territories, to discipline members of the conspiracy, to kill "snitches," etc. Witness testimony provided that Defendant's participation began in 2003, at the latest, until his arrest in 2009. (Trial Tr. P.M. Session, 31, Feb. 20, 2013.) Based on intercepted phone calls of Defendant and other Cartel members, as well as his position as a Plaza Boss, it was more than reasonably foreseeable to Defendant that Cartel members possessed dangerous weapons in connection with the conspiracy.[2]

**3.     Defendant Abused a Position of Public Trust in Furtherance of the Conspiracy.**

Pursuant to USSG § 3B1.3, a two-level enhancement is appropriate since Defendant abused a position of public trust in a manner that significantly facilitated the commission or concealment of the offense.

Two witnesses testified that Defendant used his position as a police officer to protect large shipments of Cartel drugs. Mr. Hinojosa testified that as a police officer, Defendant provided security for shipments of Cartel drugs heading towards the United States border. (Trial Tr. A.M. Session, 39, Feb. 19, 2013.) When asked how Defendant was able to provide security, Mr. Hinojosa responded, "Because he was a police officer and with every transportation truck there would be a car either ahead of the drugs or behind the drugs with some kind of authority that

---

[2] The D.C. Circuit "established a 'strict procedural mandate' that requires district courts to make explicit findings as to the scope of a defendant's conspiratorial agreement before holding him responsible for a co-conspirator's reasonably foreseeable acts. Absolute conformity with this mandate is critical, else we risk holding defendants accountable for crimes committed in furtherance of conspiracies they never joined." *United States v. Tabron*, 437 F.3d 63, 66 (D.C. Cir. 2006) (internal citation omitted).

10

would be bribed or paid for it." (Trial Tr. A.M. Session, 40, Feb. 19, 2013.) Mr. Hinojosa further

stated that Defendant provided police protection for Cartel drug loads once or twice a month,

approximately five or six times. (Trial Tr. A.M. Session, 40-41, Feb. 19, 2013.)

Mr. Lopez-Jaimes also testified that while a police officer, Defendant used his position in

the police force to benefit the Cartel. Mr. Lopez-Jaimes testified about a specific Cartel drug load

Defendant protected for him. According to Mr. Lopez-Jaimes, Defendant met him at a gas station

and the two of them drove behind the drug load in Defendant's police vehicle until the drugs

safely reached a highway. (Trial Tr. P.M. Session, 45-57, Feb. 20, 2013.) Defendant contends that

it is illogical for Defendant to only guard the drugs for a short distance. However, Mr. Lopez-

Jaimes testified that the truck only needed security on smaller roads because there were many

trucks on the highway so it did not look suspicious. (Trial Tr. P.M. Session, 54, Feb. 20, 2013.)

Similar to Mr. Hinojosa, Mr. Lopez-Jaimes testified that he and Defendant would drive past the

truck and then allow the truck to drive past them to avoid detection. (*Id.*) Mr. Lopez-Jaimes

testified that the drugs in that load made it to the border for sale. (*Id.* at 55.)

The Cartel's purpose was to transport drugs and import them for sale into the United

States. Defendant significantly aided that goal by providing police security to large drug loads

traveling towards the border.

Mr. Lopez-Jaimes also testified to other acts that Defendant committed as a police officer

to benefit the Cartel. On one occasion, Mr. Lopez-Jaimes contacted Defendant to have him collect

Cartel money that was being held by an exchange house employee. (Trial Tr. A.M. Session, 6-9,

Feb. 21, 2013.) Defendant went to the exchange house and retrieved the Cartel's money, using his

authority granted to him as a police officer. (*Id.*) On another occasion, Defendant accepted

payment to release Mr. Lopez-Jaimes' murder warrant. (Trial Tr. A.M. Session, 5-6, Feb. 21,

2013.)[3] This allowed an important Cartel drug supplier to continue to purchase marijuana for the Cartel. The fact that Defendant should not have charged a fee for this corrupt act does negate the benefit received by the Cartel or that Defendant used his position of public trust to provide the desired benefit to a Cartel member.

**4.    Defendant's Position in the Cartel Warrants an Aggravated Role Adjustment.**

A four-level enhancement is appropriate if a defendant was an organizer or leader of a criminal activity that included five or more people, or was otherwise extensive. USSG § 3B1.1(a). A three-level enhancement is appropriate if a defendant was a supervisor or manager of a criminal activity that included five or more people, or was otherwise extensive. USSG § 3B1.1(b). The evidence at trial established that, as a Plaza Boss, Defendant was a Cartel leader who directed the activities of multiple people. The Government anticipates presenting evidence that establishes Defendant controlled between 30 and 40 Cartel members.

According to trial testimony, Defendant was the Cartel's Plaza Boss in Los Guerra.  As Plaza Boss, Defendant was responsible for the Cartel's activities within Los Guerra, which also included Nogalito, Los Aldamas, Estacion Aldamas, Arcabuz, and small towns leading into Nuevo Leon. (Trial Tr. A.M. Session, 22-23, Feb. 14, 2013; Trial Tr. vol. 6, 19, Feb. 19, 2013.) Los Guerra is part of Miguel Aleman and Mr. Rejon Aguilar testified that a significant amount of drug trafficking went through Miguel Aleman.[4] (Trial Tr. A.M. Session, 36, Feb. 13, 2013.)

---

[3] Defendant suggests that this act was in violation of Cartel policy and denies any benefit to the Cartel as a result of this act.

[4] Defendant contests the inclusion of these cities. (Def.'s Comments, Corrections, and Objections to Draft PSI 4.) Defendant notes Mr. Rejon Aguilar testimony but disregards Mr. Hinojosa's testimony. Both witnesses testified to the inclusion of these cities and Mr. Hinojosa even recognized that Los Aldamas and Estacion Aldamas are in Nuevo Leon. (Trial Tr. vol. 6, 19, Feb. 19, 2013.)

A Cartel Plaza Boss was responsible for keeping records of the amount of drugs passing through his territory, for drugs or money that were unaccounted for, for providing security for drug loads, and for his staff within his territory, including lookouts and assassins, among others. (Trial Tr. A.M. Session, 34-35, Feb. 14, 2013; Trial Tr. vol. 6, 6, Feb. 19, 2013.) Mr. Hinojosa testified that Defendant specifically also had a "cold house" in his Plaza, which is where the Cartel would hold kidnapped individuals while a decision was being made on what to do with them. (Trial Tr. vol. 6, 14-16, Feb. 19, 2013.) Certainly Defendant required assistance from multiple people to carry out all of his functions as Plaza Boss. However, should the court find Defendant does not qualify as an organizer or leader, Defendant is most certainly a manager and supervisor, subjecting him to a three-level enhancement.[5]

Defendant suggests that he was not an organizer or leader based on Government's Exhibit 8.0, an organizational chart for the Cartel. Defendant contends that the leaders of the Cartel were Osiel Cardenas-Guillen, Antonio Ezequiel Cardenas-Guillen, Jorge Eduardo Costilla-Sanchez, and Heriberto Lazcano-Lazcano and the subsequent rows are members with supervisory roles. Defendant further emphasizes the geographical size of Los Guerra contending that Defendant was only responsible for a very small area.

When determining the applicability of this enhancement, the court should consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of

---

[5] *See United States v. Quigley*, 373 F.3d 133,139 (D.C. Cir. 2004) ("We read subsection (b) to sweep in lower level managerial and supervisory conduct, and subsection (a) to encompass higher level managerial and supervisory conduct. It stands to reason that one more responsible, that is, higher up in the organization's hierarchy, than a manager or supervisor for a conspiracy would herself have managerial or supervisory authority of some sort.")

the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1

n.4.  A defendant's degree of responsibility is the deciding factor when drawing the line between

organizer or leader and manager or supervisor. The D.C. Circuit has held the application

appropriate where it was suggested that others supervised the defendant but the defendant

recruited members with special skills, coordinated and directed group efforts in each members'

specific tasks, and paid members less than what he was paid. *United States v. Brodie*, 524 F.3d

259 (D.C. Cir. 2008). In contrast, the D.C. Circuit held the application of the enhancement to be

inappropriate where:

> Entirely lacking on the record before us is any evidence that Quigley had any sort
> of hierarchically superior relationship with the persons who were purportedly her
> subordinates. We understand the concept of "control" or "authority," implicit in
> the notion of "management" or "supervision," to connote some sort of
> hierarchical relationship, in the sense that an employer is hierarchically superior
> to his employee. The district court failed, however, to require any proof that
> Quigley was hierarchically superior to her co-conspirators.

373 F.3d 133, 140 (D.C. Cir. 2004). Here, there is significant evidence that Defendant was

responsible for others and was, in fact, a leader.

The size of the organization is also important to this enhancement. Mr. Rejon Aguilar

testified that the Cartel controlled a significant portion of Mexico. (Trial Tr. A.M. Session, 24-32,

Feb. 14, 2013.)  Mr. Rejon Aguilar also testified that the Cartel had 25,000 members when the

Cartel split in 2010. (*Id.* at 31.) The sheer size of the organization lends to the conclusion that four

men could not be the only leaders and organizers of an organization that spans approximately half

of Mexico.  Defendant and the other Plaza Bosses were essential in controlling the Cartel's ever

increasing power and territory.

14

## 5.      __Defendant was Directly Involved in Importation.__

Pursuant to USSG § 2D1.1(14)(C), a two-level enhancement is appropriate if the defendant receives the Aggravating Role Adjustment (leadership or management) and is directly involved in the importation of a controlled substance.  It appears Defendant's objection relies on his contention that he does not qualify for an Aggravating Role Adjustment, but as outlined above, an Aggravated Role Adjustment of either three or four levels is appropriate. With regard to the importation of a controlled substance, Defendant was directly involved in the importation of controlled substances on a number of occasions.

The best example of Defendant's role in direct importation is the 1,000 kilograms of marijuana Defendant crossed into the United States for Mr. Lopez-Jaimes. Both Mr. Hinojosa and Mr. Lopez-Jaimes testified that Defendant crossed 1,000 kilograms of marijuana from Mexico to Texas for Mr. Lopez-Jaimes in May 2007. Mr. Hinojosa testified that Mr. Lopez-Jaimes contacted him and asked him to take a ton of marijuana to Defendant so that it could be imported into the United States because Defendant's Plaza included a portion of the river. (Trial Tr. vol. 6, 35-38, Feb. 19, 2013.) Mr. Hinojosa stated that he delivered the marijuana to Defendant at his car wash. (*Id.*) Mr. Hinojosa further testified that the marijuana was imported into the United States but a portion of the marijuana was seized by law enforcement in the United States. (*Id.*) Mr. Lopez-Jaimes testified that he asked Mr. Hinojosa to deliver 1,000 kilograms of marijuana to Defendant so that Defendant could import the marijuana into Roma, Texas. (Trial Tr. A.M. Session, 28-31, Feb. 21, 2013.) Mr. Lopez-Jaimes testified that some of the marijuana made it to its final destination in the United States, while another portion did not, including 500 kilograms which were seized in Falfurrias, Texas. (*Id.*) This transaction was also confirmed by intercepted phone calls between Defendant and Lopez-Jaimes. (*See* Government Ex. 3.47 and 3.48.)

15

The Government introduced additional evidence that Defendant was directly involved in importation. Mr. Hinojosa testified that, as Plaza Boss, Defendant was responsible for crossing drugs into the United States because Defendant's Plaza included the river. (Trial Tr. vol. 6, 14, Feb. 19, 2013.) Mr. Rejon Aguilar testified to "pollas" he participated in with Defendant where they brought in significant quantities of marijuana to the border region. (Trial Tr. A.M. Session, 36, Feb. 13, 2013.) There were also a number of phone calls where Defendant discussed importation of drugs.  Mr. Lopez-Jaimes testified regarding Defendant's role as police security for a fourteen or fifteen ton load of narcotics, which successfully made it to the border and was imported into the United States. (Trial Tr. P.M. Session, 45-57, Feb. 20, 2013.)

   **B.     A Sentence of Incarceration for Life Complies With the Factors and Considerations Set Forth in 18 U.S.C. § 3553(a).**

Notwithstanding the statutory minimum of ten years, the Government respectfully submits that a sentence of life imprisonment in this case, which is the maximum sentence for the offense, is sufficient, but not greater than necessary, to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

   **1.     Nature and Circumstances of the Offense**

Defendant committed a serious crime against the United States, having conspired to distribute five kilograms or more of cocaine and 1,000 kilograms or more of marijuana for importation into the United States. The Government anticipates eliciting testimony at sentencing that the Cartel successfully moved billions of dollars worth of cocaine and marijuana into the United States. Marijuana and cocaine are highly addictive drugs that are abused at a significant cost to the users, their families, the medical community, law enforcement, and society in general. Lives are ruined, families are torn apart, jobs are lost, and medical resources are stretched to the

limit as a result of these drugs. Furthermore, corruption and violence are commonly associated with drug use and trafficking, as was made abundantly clear in this case. Thus, Defendant and his co-conspirators' decade long agreement to send tons of cocaine and marijuana into the United States is undoubtedly serious.

The manner in which the Cartel and Defendant conducted its business is particularly concerning.  The Cartel relied on violence and corruption to continue their enterprise. Cartel members used acts of violence against anyone who threatened their business, from kidnapping, torture to murder.  (Trial Tr. A.M. Session, 35-36, Feb. 14, 2013; Trial Tr. A.M. Session, 35-36, Feb. 15, 2013; Trial Tr. vol. 6, 14-16.)  Many of the leaders of the Cartel, including Defendant, were public servants, including prosecutors, police officers, soldiers and others, who used their positions to benefit the Cartel. (Trial Tr. A.M. Session, 10-19, 39-41, Feb. 19, 2013; Trial Tr. vol. 6, 7-8, Feb. 19, 2013; Trial Tr. P.M. Session, 45-57, Feb. 20, 2013.)

In furtherance of this conspiracy, and while a police officer, Defendant provided security for Cartel drug loads being transported to the border.  Subsequently, Defendant served as a Cartel Plaza Boss, overseeing Cartel operations in Los Guerra.  He was not a regular member of a small time operation; Defendant was a corrupt police officer and then a leader in an extremely violent and large scale, international drug smuggling operation.

Perhaps most troubling is Defendant's lack of concern for the value of human life.  In two recorded calls previously discussed Defendant reports to Mr. Flores-Borrego that he has learned that someone is "snitching" on him. (*See* Government Ex. 3.21; 3.22.) When Mr. Flores-Borrego says that he will send assassins to kill the person, Defendant expresses no concern. (*Id.*)  Instead, Defendant showed support for the murder to occur, because the act obviously benefitted him. (*Id.*)

Also, Mr. Hinojosa testified that Defendant controlled the "cold house" in Defendant's Plaza, which is where the Cartel held kidnapped individuals. (Trial Tr. vol. 6, 14-16, Feb. 19, 2013.)

The Government submits, based on the circumstances of the instant case and Defendant's roles in the Cartel, that a sentence of life will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct by Defendant and others who would engage in such illegal conduct and protect the public from further crimes of the Defendant.

## 2.       History and Characteristics of the Defendant

The Defendant is a Mexican citizen who was residing in Mexico at the time of his involvement in the conspiracy and his arrest.  The PSR provides limited information on the Defendant's childhood, family history, employment, or any other personal history factors to guide the Court on whether his history and characteristics are remarkable so as to warrant a sentence below the Guidelines range.

The Government submits that a sentence of life adequately accounts for the Defendant's history and characteristics as a large-scale trafficker with demonstrated intent and capacity to smuggle drugs internationally and a lack of concern for human life.

## 3.       Avoiding Disparity Among Similarly-Situated Defendants

Section 3553(a)(6) articulates "the need to avoid *unwarranted* sentence disparities among defendants *with similar records* who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (italics added).  By its terms, the statute requires a specific evaluation of the defendants' records and conduct.  When determining whether a sentence creates an unwarranted disparity, the Court should also consider a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and

18

whether and to what extent a defendant cooperated.  *See, e.g.*,  *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was entirely explained by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's "harsher" sentence was not unwarranted); *United States v. Colwell*, 304 F. App'x 885, 885-86 (D.C. Cir. 2008) (upholding sentence against § 3553(a)(6) challenge on the basis of co-conspirators' criminal history category and number of fraudulent transactions in which co-conspirators participated, how much co-conspirators contributed to conspiracy's success, and crime to which each co-conspirator pled guilty); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007) (concluding sentence not unwarranted because defendant and co-conspirators "did not hold comparable positions, either in the conspiracy or in their workplaces" and co-conspirators "provided substantial assistance in the investigation of the scheme, while [the defendant] did not").   A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result."  *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

However, § 3553(a)(6) is only one factor the Court should consider when sentencing the Defendant.  *Colwell*, 304 F. App'x at 886; *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006) ("[T]he requirement that a sentencing judge consider an 18 U.S.C. § 3553(a) factor is *not* synonymous with a requirement that the factor be given determinative or dispositive weight in the particular case, inasmuch as it is only one of several factors.").  Thus, this Court should consider all of the § 3553(a) factors to determine whether they support the Defendant's sentence.  *Gall*, 552 U.S. at 49-50; *see also Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ("Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities – along with other § 3553(a) factors – when imposing sentences.").

19

Only one defendant in the case has been sentenced to date and another is awaiting sentencing.  Defendant Fourteen, Alfonso Lam-Liu, pleaded guilty in the Southern District of Texas to Count 1 of this Indictment, the same charge Defendant was found guilty of at trial. After accepting responsibility and not requiring the Government to prove its case at trial, Mr. Lam-Liu was sentenced to 235 months imprisonment. Like Defendant, Mr. Lam-Liu was a Cartel Plaza Boss on a border town, specifically Rio Bravo. However, unlike Defendant, Mr. Lam-Liu did not abuse a position of public trust and he accepted responsibility for his actions. Mr. Rejon Aguilar is pending sentencing on the present Indictment. He accepted a plea agreement with a Guideline calculation of life, which like any defendant may be reduced based on substantial assistance. Therefore, sentencing Defendant to a term of imprisonment of life, will not result in an unwarranted sentence disparity as contemplated by § 3553(a)(6).

### 4.   <u>Additional Factors to Consider</u>

Defendant contends that he should not be punished for exercising his right to trial and suggests he should receive a sentence proportionate to his role in the Cartel. Defendant fails to acknowledge the reduction he has already received as a result of the limitations of the Sentencing Table. As calculated by the PSR, Defendant's Total Offense Level, after the applicable enhancements, was a 47 but was reduced because the Sentencing Table ends at 43. This is not a case where a defendant just meets the threshold for life. Defendant met the threshold and exceeded it significantly.

Further, it is noteworthy that based on the quantity of drugs imported by the Cartel and Defendant, the Government could have sought an upward departure. USSG § 2D1.1 n.26(B). The Sentencing Commission notes that "an upward departure may be warranted where the quantity is at least ten times the minimum quantity required for level 38." *Id*.  At trial, the Government

established that the Cartel was responsible for importing into the United States ton quantities of marijuana and cocaine on a frequent basis. The conspiracy was ongoing for ten years. The amount of marijuana and cocaine the Cartel and Defendant are responsible for far exceeds that considered by Defendant's Base Offense Level. However, since Defendant's Guideline range is already life, no upward departures were sought.

## IV.    <u>CONCLUSION</u>

Therefore, for the above-stated reasons, the United States submits that a sentence of life imprisonment is sufficient but not greater than necessary to comply with the factors set forth in 18 U.S.C. § 3553(a).  Therefore, the United States respectfully requests that this Court impose upon Defendant a sentence of life imprisonment.

Respectfully submitted this 3rd day of May 2013.

<div style="margin-left:40%">

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By:    /s/ Sean Torriente
Sean Torriente, Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division / U.S. Department of Justice
145 N Street, NE, East Wing, Second Floor
Washington, DC 20530
Tel: (202) 353-3832 / Fax: (202) 514-0483
Sean.Torriente@usdoj.gov

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of May 2013, I filed the foregoing GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING with the Clerk of the Court via ECF / CM.  A copy will be served on the following via the Notice of Electronic Filing (NEF) system:

<u>Counsel for Defendant Aurelio Cano-Flores</u>
Richard Gilbert
601 Pennsylvania Avenue, NW
Suite 900, South Building
Washington, DC 20004
(202) 898-0857
rkgesq@juno.com

Kristen Hughes
1390 Chain Bridge Road
Suite 530
McLean, Virginia 22101
(703) 798-4444
kghughes@hotmail.com

/s/  Sean Torriente
Sean Torriente, Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division / U.S. Department of Justice
145 N Street, NE, East Wing, Second Floor
Washington, DC 20530
Tel: (202) 353-3832 / Fax: (202) 514-0483
Sean.Torriente@usdoj.gov