<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3       United States of America,    ) Criminal Action
                                      ) No. 08-cr-057
 4                      Plaintiff,    )
                                      ) MOTION HEARING
 5       vs.                          )
                                      ) Washington, DC
 6       Aurello Cano-Flores,         ) October 9, 2019
                                      ) Time:  1:30 p.m.
 7                      Defendant.    )
         _____
 8
                      TRANSCRIPT OF MOTION HEARING
 9                          HELD BEFORE
           THE HONORABLE MAGISTRATE JUDGE DEBORAH A. ROBINSON
10                 UNITED STATES MAGISTRATE JUDGE

11       _____

12                     A P P E A R A N C E S

13       For the Plaintiff:      Kaitlin Julia Sahni
                                 Cole Arnold Radovich
14                               U.S. Department of Justice
                                 Narcotics and Dangerous Drug Section
15                               145 N Street, NE
                                 Second Floor, East Wing
16                               Washington, DC  20530
                                 (202) 598-2493

17       For the Defendant:      Kira Anne West
                                 Law Offices of Kira Anne West
18                               1325 G Street, NW
                                 Suite 500
19                               Washington, DC  20005
                                 (202) 236-2042
20
         _____
21
         Interpreter:            Theresa Salazar
22
         Court Reporter:         Janice E. Dickman, RMR, CRR
23                               Official Court Reporter
                                 United States Courthouse, Room 6523
24                               333 Constitution Avenue, NW
                                 Washington, DC  20001
25                               202-354-3267
</pre>

1          THE COURT:  Good afternoon.

2          MS. WEST:  Good afternoon, Your Honor.

3          THE COURTROOM DEPUTY:  This is criminal case 08-057,

4     the United States of America versus Aurelio Cano-Flores.

5          Cole Radovich and Kaitlin Sahni representing the

6     government.  Kira West and Nicole Cubbage representing the

7     defendant.  Spanish interpreter is Theresa Salazar.  This

8     matter is set for oral argument motion hearing.

9          THE COURT:  Good afternoon to all of you.

10          MS. WEST:  Good afternoon, Your Honor.

11          MS. SAHNI:  Good afternoon, Your Honor.

12          MR. RADOVICH:  Good afternoon, Your Honor.

13          MS. WEST:  I think Ms. Salazar needs a minute to

14     interpret that.  We're trying to determine how to do it best.

15          THE COURT:  Now, I thank all of you.  Mr. Cramer, we

16     thank you for making the arrangements so that Mr. Cano-Flores

17     could be present.

18          The Court scheduled this hearing in order to ensure

19     that I could hear from you, Counsel, regarding an issue that

20     emerged during the Court's consideration of the post-hearing

21     submissions.

22          Since the Court scheduled the hearing, the Court

23     reviewed a decision of a judge of this court which appeared to

24     be of immediate relevance.  And my law clerk provided each of

25     you with a courtesy copy of that decision earlier this

1    afternoon.

2                    THE INTERPRETER:  May we pause here, Your Honor?

3                    (Pause.)

4                    THE COURT:  Just so the record is clear, the opinion

5    to which I refer is *United States against Angel Torres*, cited

6    at 66 F.Supp.2d 30.

7                    It is a 1999 decision of a judge of this court, Judge

8    Lamberth.  The language in that opinion, to which I will direct

9    your attention, appears on page 36 of the opinion.  It reads as

10   follows:  The Court might be inclined, on the foundation of the

11   provisions and cases cited above, to hold that the reasonably

12   effective assistance of counsel guaranteed by the Sixth

13   Amendment includes out-of-court lawyer-client communications,

14   either directly or -- excuse me, either directly in defendant's

15   primary language, or through an interpreter in the case of a

16   defendant whose English language ability is so low as to

17   prohibit effective communication in English.

18                    However, the Court need not dwell on this issue

19   because defendant Torres has failed to demonstrate that his

20   English language ability was inadequate to permit effective

21   communication between him and his attorney.

22                    Now, Counsel, without asking that you deviate from

23   the manner in which you prepared to present your argument, I

24   will ask that you prepare to address the extent to which, if

25   any, you believe that the second sentence of the paragraph in

1    Judge Lamberth's opinion from which I read is applicable here.

2            Ms. West and Ms. Cubbage, as counsel for the movant,

3    I will hear from you first.

4            Good afternoon, Ms. West.

5            MS. WEST:  Good afternoon, Your Honor.  As a

6    preliminary matter, I would like the Court to know

7    Mr. Cano-Flores and I spoke before you took the bench, in

8    Spanish, without the aid of an interpreter.  And he can see me

9    arguing in the screen that he has in Beaumont, Texas, in front

10   of him.

11           THE COURT:  Thank you.  Ms. West, you have indicated,

12   on multiple occasions during the course of these proceedings,

13   that you are fluent in Spanish.  But, because you said you

14   spoke without an interpreter, just so that the record of

15   today's hearing is clear, would you indicate the basis upon

16   which you were able to speak with Mr. Cano-Flores without an

17   interpreter?

18           MS. WEST:  Yes, Your Honor.  While I was speaking

19   with Mr. Cano-Flores in Spanish, the interpreter was here,

20   seated to my left.  But we didn't need her.  And she was able

21   to listen to the entire conversation.  But my Spanish is not

22   nearly as good as a court-certified interpreter.  But we can

23   communicate about legal issues.

24           THE COURT:  Did Mr. Cano-Flores indicate at any time

25   that he did not understand anything that you said?

1          MS. WEST:  No, Your Honor.

2          THE COURT:  You may proceed with your argument.

3          MS. WEST:  Yes, Your Honor.  As the Court knows, we

4     filed a brief, docket entry No. 415, addressing the issues that

5     the Court indicated you wanted information and argument on.

6          THE COURT:  I have reviewed it in detail.

7          MS. WEST:  So I will briefly highlight what we

8     believe the issues are and, in accordance with the Court's

9     order, discuss *United States versus Torres*.

10         THE COURT:  Thank you.

11         MS. WEST:  Basically, Your Honor, there are three

12    points that we would like to make today.  Number one, there was

13    no communication with Mr. Cano-Flores during a critical phase

14    of his trial.  Reliance on past conversations are not enough.

15         Number two, Mr. Gilbert did not even attempt to

16    discuss during trial with Mr. Cano-Flores the issues that were

17    presented during the proceedings.  Even though Mr. Cano-Flores,

18    before trial and during trial, begged for an interpreter to sit

19    with him at counsel's table for assistance in communicating

20    with his lawyer.

21         THE COURT:  Ms. West, what is your response to the

22    broad contention of counsel for the government that

23    Mr. Cano-Flores has not shown what he wrote or what he tried to

24    communicate that would have aided in his defense?

25         MS. WEST:  We believe, Your Honor, that that is an

1    irrelevant contention because Mr. Gilbert's proficiency in

2    Spanish or Mr. Cano's proficiency in English is really not an

3    issue when there's absolutely no communication at all during

4    that time.

5        Specifically, we believe that the Court here can

6    presume prejudice under the *Cronic* test.  Unlike a *Strickland*

7    analysis when you have to state specific errors that undermine

8    the finding of guilt, the *Cronic* court held that no specific

9    errors are necessary when prejudice is presumed.  And,

10   therefore, this Court does not have to reach the merits of

11   Mr. Cano-Flores's underlying claim.  All three *Cronic* factors,

12   incidentally, are present here.

13       *Cronic* applies when counsel has entirely failed to

14   function as Mr. Cano-Flores's advocate.  As the D.C. Circuit

15   held in *United States versus Bell*, a cold record cannot

16   recreate testimony.  Mr. Cano-Flores contends that he was

17   denied counsel at a critical stage of his trial, so the

18   prejudice is presumed under *Garza versus Idaho*.

19       As the Court has previously heard testimony and read

20   briefing, that was done in two ways, this prejudice.  There was

21   no communication between Mr. Cano-Flores and Mr. Richard

22   Gilbert during the trial, before the trial, during breaks in

23   the trial, or after the trial, with the exception of one time.

24       Now, the government is going to tell this Court that

25   Mr. Gilbert met with Mr. Cano-Flores two times during the

 1    course of the trial.  And technically, perhaps, that's true

 2    because February 11th, the first day of trial, Mr. Gilbert did

 3    in fact meet with Mr. Cano-Flores.  But that court proceedings

 4    on February 11th was picking the jury and no testimony had been

 5    taken at that time.

 6         Which leads me to the second reason under *Garza* that

 7    prejudice should be presumed.  There was no adverse --

 8         THE COURT:  Under *Garza* or under *Cronic*?

 9         MS. WEST:  Under *Cronic*, Your Honor.  I apologize.

10    It's provided in *Garza versus Idaho*.

11         THE COURT:  Very well.  Please continue.

12         MS. WEST:  If I can have a moment to find the page.

13    It is, Your Honor, in Section 1 of the Court's opinion.  The

14    Court held:  Similarly, prejudice is presumed if counsel

15    entirely failed to subject the prosecution's case to meaningful

16    adversarial testing, citing *Cronic*.

17         THE INTERPRETER:  The interpreter would ask a slower

18    reading of it, please.

19         THE COURT:  Very well.  Thank you.

20         THE INTERPRETER:  Could the interpreter have a

21    repetition of that, please?

22         MS. WEST:  Similarly, prejudice is presumed if

23    counsel entirely failed to subject the prosecution's case to

24    meaningful adversarial testing, citing *Cronic*.

25         Mr. Cano-Flores was, arguably, denied effective

1    assistance of counsel at the most important phase of a trial,

2    which would be cross-examination of witnesses.

3            The confrontation clause requires that

4    Mr. Cano-Flores have effectively cross-examined witnesses on

5    his behalf.  In other words, pretrial preparation and the use

6    of a notebook during trial is not enough because that is not

7    effective communication with your lawyer such that you can

8    specifically cross-examine a witness on such things, such as

9    bias and prejudice, which is why the Supreme Court reversed the

10   conviction in *Davis versus Alaska*.  In that case the defence

11   lawyer was prohibited from cross-examining on bias

12   specifically.

13           This Court may recall the testimony of Mr.

14   Cano-Flores when he said he wanted to communicate with his

15   lawyer during cross-examination of witnesses who were saying

16   things that were not true.

17           I am still baffled by the agreement between

18   Mr. Cano-Flores and Mr. Richard Gilbert, his lawyer, that a

19   notebook would be sufficient to communicate with during the

20   course of trial, especially because the testimony showed that a

21   court-certified interpreter was at Mr. Gilbert's disposal

22   during all parts of the proceedings.

23           THE COURT:  How do you wish the Court to evaluate for

24   this purpose the testimony that on at least some of the

25   evenings during the course of the trial Miriam Valencia spoke

1    to Mr. Cano-Flores at the D.C. jail?

2              And to add the second component of that question --

3    and I apologize, it is compound -- and we assume -- or, to what

4    extent can we assume that Ms. Valencia communicated

5    Mr. Cano-Flores's concerns to Mr. Gilbert?

6              MS. WEST:  With regard to the first part of your

7    question, how do you wish the Court to evaluate the testimony

8    of Miriam Valencia, that she spoke to Mr. Cano-Flores at night

9    at the jail, this first part?

10              THE COURT:  That is correct.  Recognizing, of course,

11    that Ms. Valencia was not a witness and the Court is relying

12    upon what could well be regarded as hearsay concerning what

13    Ms. Kristen Hughes suggested may have occurred with regard to

14    communication with Mr. Gilbert.

15              MS. WEST:  I think that the Court --

16              THE INTERPRETER:  The interpreter needs --

17              THE COURT:  I apologize that the question has now

18    become hopelessly compounded.  But it is the issue -- I ask the

19    question in that way because to some extent the Court could

20    read the government's submission as --

21              THE INTERPRETER:  Your Honor, excuse me.  The

22    interpreter would need a repetition.

23              THE COURT:  Shall I start over?

24              THE INTERPRETER:  May the interpreter interpret up to

25    the point --

1          THE COURT:  Yes.  I'm sorry.

2          I recognize if I were a lawyer who asked that

3     question, the objection to it would be sustained and I would be

4     asked to rephrase it.  However, I am attempting to characterize

5     what I understand as a part of the government's argument, which

6     requires -- which, if the Court adopted, would require that the

7     Court make those intermediate findings that I included in the

8     question.

9          MS. WEST:  I believe that this Honor should discount

10    anything that Miriam Valencia had to say to anybody, and here's

11    why:  As the Court might recall from previous testimony,

12    Ms. Valencia absented herself from this proceeding purposely.

13    She fled to Colombia.  What the Court should consider, when

14    looking through the prism of what did Miriam Valencia do in

15    this case? the court should remember that Mr. Cano-Flores had a

16    very good court-appointed lawyer who spoke Spanish at the very

17    beginning of his case.  But Miriam Valencia, without permission

18    of that lawyer, went to Mr. Cano-Flores at the D.C. jail and

19    told him that if he hired Rich Gilbert, he would win his case

20    and send him home.

21         So we cannot assume that Miriam Valencia communicated

22    any concerns of Mr. Cano-Flores to Mr. Gilbert.

23         Interestingly, there is a dearth of evidence, which

24    would include emails or letters, between Mr. Gilbert and

25    Ms. Valencia about this representation.  Specifically, even

1    though some of those notes were translated by yet another

2    uncertified interpreter, we don't know if Mr. Gilbert ever read

3    those communications.  We do know he never responded to those

4    communications, and we know from Mr. Cano-Flores that he never

5    spoke to the client about his concerns.

6           Moreover, Miriam Valencia is not a lawyer.

7    Mr. Cano-Flores is entitled to the advice of his lawyer,

8    especially while he's in trial.

9           If I might, Your Honor, I would like to turn --

10    because I think the issues you're just now talking about are

11    important to the subject, the Court has handed us *United States*

12    *versus Torres*, which I recognize perhaps I cited it or the

13    government cited it in a previous brief.  And it was important

14    for this Court to recognize that this case, this opinion was

15    written by Judge Lamberth in 1999.

16           What's interesting about *Strickland* and *Cronic* is

17    that those two cases were decided by the Supreme Court in 1984,

18    during the same term; which was then 14 years before *Torres*.  I

19    also think it's important that it was the Honorable Royce C.

20    Lamberth who wrote *Torres* and starts his opinion with:  Rather

21    than plead guilty and cooperate with the government

22    investigation, Torres opted to proceed to trial.  The judge

23    determined that Torres had voluntarily absconded from the

24    trial, issued a bench warrant for his arrest, and proceeded

25    with the trial in his absence.

1          The *Torres* case can be distinguished in many ways

2     from Mr. Cano-Flores's case.

3          First of all, there were three witnesses that

4     testified at trial that Judge Lamberth relied on in writing his

5     opinion.  A doctor who is an English language specialist, a

6     former MPD police officer who became a U.S. marshal, and a

7     pretrial services officer.  All three of those people who

8     testified at his trial said that the defendant, Mr. Torres,

9     could speak English.  The Court will recall from the testimony

10    with Mr. Cano-Flores in this case, Mr. Cano-Flores does not

11    speak one word of English.

12          Finally, there was the defense lawyer in that case,

13    Ms. Jolles.  She testified that for a period of 19 hours she

14    was able to speak to her client in English only.  Miss Jolles

15    did not speak Spanish.  Another distinguishing factor is she

16    actually testified that she established a relationship with her

17    client.  And this is critical because her client helped her

18    locate witnesses for the trial.

19          Judge Lamberth discounted the testimony of the doctor

20    because he believed that the defendant, when interviewed by the

21    doctor about his English language skills, lied about his

22    ability.

23          Judge Lamberth cited *Geders versus United States*, a

24    1976 Supreme Court case, in which that Court stated a defendant

25    requires the guiding hand of consulate every step in the

1    proceedings against him.

2              This Court, Your Honor, has asked us to look at

3    paragraph 3, entitled Application, where Judge Lamberth says

4    that he would probably have been inclined, on the foundation of

5    the cases cited above, to hold that the reasonably effective

6    assistance of counsel guaranteed by the Sixth Amendment

7    includes lawyer-client communication.

8              But he didn't reach the issue because the defendant

9    in this case, Mr. Torres, spoke English.  But what Judge

10   Lamberth did indicate -- which is most important with your

11   relationship with your lawyer -- is the defendant's, quote,

12   ability to communicate with counsel in a meaningful way, end

13   quote.

14             And finally, the *Torres* case is distinguished in two

15   more ways.  Mr. Torres, the defendant in that case, had lived

16   in the United States since 1972.  Of course, the Court will

17   remember that Mr. Cano-Flores was arrested in Mexico and

18   extradited to the United States.  So, for nearly two decades

19   Mr. Torres had lived in the United States.

20             Finally, Mr. Torres never requested the services of

21   an out-of-court communication interpreter.  The Court will

22   remember Mr. Cano-Flores specifically stating that he wanted

23   that during trial.

24             Finally, I would just ask the Court, imagine that you

25   are Mr. Cano-Flores and you are in Mexico, you are arrested and

1    handcuffed.  You've never been to the United States.  You're

2    put on a plane and flown to the United States, you don't have a

3    lawyer, you end up at the D.C. jail.  A lawyer is appointed for

4    you that speaks your language, but some strange woman comes to

5    you and says to hire somebody else.  And you do that because

6    you don't know what the legal process is in the United States

7    of America.  You think it's normal, during your trial, not to

8    talk to your lawyer because nobody tells you any different.

9    And as a Mexican male, you don't question the system.

10             And not until your case has gone to the Supreme Court

11    and back and you finally get a lawyer, Tony Martin, who speaks

12    Spanish, and before that you finally get a court-certified

13    interpreter that Mr. Gilbert brings after the case has already

14    gone up to the Supreme Court, and when you hear this court-

15    certified interpreter translate what your lawyer's saying to

16    you, you have an epiphany that this is how it's supposed to be.

17             The problem for Mr. Cano-Flores is that that came too

18    late.  The Sixth Amendment is supposed to protect people like

19    Mr. Cano-Flores.  A one-way communication is not meaningful for

20    constitutional standards.  What Mr. Cano-Flores was doing was

21    like putting a message in a bottle, sending it out there and

22    hoping he got a response.  Not communicating with your client

23    is the equivalent of sleeping through trial.  And, therefore,

24    what happened in this case is a structural error that affects

25    the framework of the trial and because of that the guilt or

1    innocence can't be determined constitutionally.

2              As the Fourth Circuit said in *United States versus*

3    *Ragin*, The errors and lost opportunities may not be visible in

4    the record, and the reviewing Court applying the traditional

5    *Strickland* analysis may be forced to engage in unguided

6    speculation.

7              THE INTERPRETER:  The interpreter asks for repetition

8    of the last --

9              MS. WEST:  *Strickland* analysis may be forced to

10   engage in unguided speculation.

11             Because when counsel is absent physically, the evil

12   lies in what the attorney does not do and is either not readily

13   apparent on the record or occurs at a time when no record is

14   made.  Here, Mr. Cano-Flores did not and was not able to

15   consult with his lawyer or receive informed guidance from him

16   during the course of his trial.

17             Therefore, he was denied constitutional protections

18   at a critical stage of the proceedings.  And that's why we ask

19   that his conviction be vacated.

20             THE COURT:  Thank you very much, Ms. West.

21             Ms. Sahni.

22             MS. SAHNI:  Thank you, Your Honor.

23             THE COURT:  Good afternoon.

24             MS. SAHNI:  Good afternoon.  May it please the Court.

25             The government's position, as stated in its

1    memorandum of law filed on September 6th, is that the defendant

2    has failed to meet his extremely high burden to prove that the

3    presumption of prejudice recognized in *Cronic* --

4           THE INTERPRETER:  Your Honor, the interpreter would

5    ask that there be pauses during all of that, please.

6           MS. SAHNI:  So repeat?

7           THE INTERPRETER:  Please.  With pauses.

8           MS. SAHNI:  The government's position, as stated in

9    its memorandum of law filed --

10           THE INTERPRETER:  Go ahead.

11           MS. SAHNI:  -- filed on September 6th, is that the

12    defendant has failed to meet the extremely heavy burden to show

13    that the presumption of prejudice recognized in *Cronic* applies

14    to his case.

15           The defendant has not proven and cannot prove that

16    his defense counsel's representation was so deficient that it

17    effectively amounted to no representation at all.

18           THE COURT:  Ms. Sahni, do you acknowledge that the

19    evidence adduced at the evidentiary hearing must be read by the

20    Court -- must be interpreted by the Court as evidence that

21    Mr. Gilbert did not communicate with Mr. Cano-Flores at all

22    during the trial?

23           MS. SAHNI:  No, Your Honor.

24           THE COURT:  Let me ask you then --

25           THE INTERPRETER:  May the interpreter interpret that?

 1          THE COURT:  I apologize, Ms. Salazar.

 2          May I ask you, Ms. Sahni, to identify the volume of

 3     the transcript, the page number and the line number which

 4     reflect communication between Mr. Cano-Flores and Mr. Gilbert

 5     during the trial?

 6          MS. SAHNI:  Your Honor, I apologize --

 7          THE COURT:  I will exclude, for the sake of -- for

 8     the sake of clarity, the single visit that the record reflects.

 9          Perhaps I should say, the single visit that the Court

10     recalls that the record reflects.  If there are others, I will

11     ask you to please identify them by volume, page and line

12     number, communications between Mr. Cano-Flores and Mr. Gilbert.

13          If you need a brief recess or an opportunity to

14     confer with your co-counsel before you respond, you may do

15     that.

16          MS. SAHNI:  Your Honor, I have dates and page

17     numbers.  I do not have at the ready line numbers, but it's up

18     to Your Honor whether you would like a brief break for me to

19     find those or whether the pages are sufficient.

20          THE COURT:  Did you indicate that you have a date on

21     which the testimony was taken?

22          MS. SAHNI:  Yes, Your Honor.

23          THE COURT:  In that event, you may proceed.

24          MS. SAHNI:  The government would cite to two

25     citations in the hearing transcript.  The first is November 29,

 1    2018, at page 46.

 2            THE COURT:  Will you read, please, the lines which

 3    reflect communications -- I apologize, communications between

 4    Mr. Cano-Flores and Mr. Gilbert?  I will first indicate -- or,

 5    ask you to indicate, excuse me, whose testimony -- or, from

 6    whose testimony you are reading, Mr. Cano-Flores' testimony or

 7    Mr. Gilbert's testimony.

 8            MS. SAHNI:  Yes, Your Honor.  I am going to be

 9    reading page 46, starting at line 5.  And this is the

10    government asking questions of Mr. Gilbert.

11            THE COURT:  You may proceed.

12            MS. SAHNI:  "Question:  While you were seated at the

13    defense table, how did the defendant typically communicate with

14    you?

15            "Answer:  In writing.

16            "Question:  Did he pass notes to you?

17            "Answer:  He would sometimes slide his notes over so

18    that I could see them.

19            "Question:  And were those notes in Spanish?

20            "Answer:  Yes.

21            "Question:  Were you generally able to understand the

22    notes in Spanish?

23            "Answer:  Yes.

24            "Question:  What, if anything, did you do to

25    acknowledge that you had received a note?

1    "Answer:  I might have looked at him and nodded, or

2    in some way indicated that I had seen it.

3    "Question:  Did you and the defendant agree before

4    trial that he could write notes to you to communicate with you?

5    "Answer:  Yes."

6    The government would also point to Miss Hughes'

7    testimony on December 3rd, 2018, at page 89.

8    MS. WEST:  I'm sorry, I didn't get the date.

9    MS. SAHNI:  December 3rd.

10    THE COURT:  Thank you.  And the page number again,

11    Ms. Sahni?

12    MS. SAHNI:  89.

13    Court's indulgence.

14    THE COURT:  Ms. Sanai, but may I ask, before you

15    address the testimony on December 3rd, if we can backtrack one

16    moment, to November 29th?

17    You've read a number of lines of page 46.  In one

18    excerpt which you read, Mr. Gilbert indicated that

19    Mr. Cano-Flores, in response to your question, that he nodded

20    to Mr. Cano-Flores to indicate that he saw the note, is that

21    correct?

22    MS. SAHNI:  Yes, Your Honor.

23    THE COURT:  What does the record reflect with respect

24    to Mr. Gilbert's answer to Mr. Cano-Flores concerning the

25    notes?

1          Put another way, what did Mr. Gilbert say in response

2    to any note?

3          MS. SAHNI:  Your Honor, I don't believe that there

4    was testimony that Mr. Gilbert said anything in response.

5          THE COURT:  If that is indeed the case, can the Court

6    conclude that there was no communication between them?  In

7    other words, if the evidence is that Mr. Cano-Flores gave a

8    note to Mr. Gilbert, but Mr. Gilbert did not give a note to

9    Mr. Cano-Flores in response, nor did he respond verbally, does

10   that not mean that the Court must find that there was no

11   communication?

12         MS. SAHNI:  No, Your Honor.  I don't --

13         THE COURT:  Indeed, does the very term

14   "communication" not presuppose a dialogue, whether it is a

15   question and answer or some other form of exchange, as opposed

16   to a one-sided passing of a note as to which no response was

17   ever given to the person who passed the note?

18         MS. SAHNI:  No, Your Honor, for several reasons.

19         THE COURT:  To what does your answer "no" apply?  Are

20   you suggesting that communication can be found where one person

21   gives a note to a second person, but the second person does not

22   return a note, or respond to the note verbally?  Are you

23   suggesting that that is sufficient to satisfy the definition of

24   communication?

25         MS. SAHNI:  Yes, I am suggesting that, Your Honor,

1    because --

2         THE COURT:  On what authority do you rely for that

3    proposition?  Is there a case that holds that such a

4    circumstance represents meaningful communication between an

5    individual on trial and his or her lawyer?

6         MS. SAHNI:  Your Honor, I'm not citing to a specific

7    case, but just common, real world experience that a physical

8    act --

9         THE COURT:  What common world experience would leave

10   any of us to reasonably conclude that if we offered a note to

11   someone, the person received the note and didn't give a note

12   back, and didn't say anything, that that would be regarded as

13   communication?

14        MS. SAHNI:  Mr. Gilbert testified that most of these

15   notes related to --

16        THE COURT:  Let me ask you to answer the Court's

17   question.  You indicated that there is no authority that you

18   are able to cite for the proposition that the scenario I just

19   described represents effective communication between an

20   individual charged with an offense who is on trial and his or

21   her lawyer.  You then indicated that you are relying on real

22   world experience.

23        My question to you is:  In what context would a

24   person reasonably conclude that there had been effective

25   communication with a second person who did not respond in any

1    way to something communicated by note; didn't write a note

2    back, didn't say anything?  What is the real world experience

3    to which you refer?

4         To offer a hypothetical to further illustrate the --

5    or, perhaps render more concrete the question that I'm asking

6    you to answer, if you were to go to Mr. Radovich, your

7    co-counsel, right now and ask him -- give him a note and ask

8    him for a cite to a transcript passage and Mr. Radovich looked

9    at you and nodded, but didn't write anything down, didn't tell

10   you he needs a moment to find it, you didn't see him searching

11   for it, he made no effort to look for it, didn't ask for a

12   recess and simply nodded, would you believe you had

13   communicated with him?

14        MS. SAHNI:  Respectfully, Your Honor, I think your

15   hypothetical is a little different than the nature of the notes

16   that Mr. Cano-Flores was passing to Mr. Gilbert.

17   Mr. Gilbert --

18        THE COURT:  Let me again ask you to answer the

19   Court's question, which is:  In what real world scenario, since

20   that is what you indicated is the basis of your argument, would

21   the passing of a note by person A to person B, where person B

22   nods but does not write a note back or say anything, constitute

23   effective communication?  That was my question.  I asked the

24   hypothetical only because, after asking you twice, you did not

25   answer my question.

1          MS. SAHNI:  The real world situation is that

2     Mr. Gilbert's reading the note and nodding to acknowledge that

3     he had read and understood the note was a form of communication

4     that was appropriate for this type of note.

5          THE COURT:  What do you mean by, quote, type of note,

6     close quote?

7          MS. SAHNI:  Mr. Gilbert testified that most of the

8     notes indicated the defendant's belief that one of the

9     witnesses was lying.  And Mr. Gilbert had already discussed

10    with the defendant at great length his -- the defendant's

11    belief that these witnesses were going to lie.  And if I may

12    read --

13         THE COURT:  Does that mean that the government is now

14    arguing that the mere fact that a defendant and his or her

15    lawyer may have discussed an issue prior to trial, that the

16    defendant ought not have the opportunity to communicate with

17    the lawyer about the same issue during trial?  That appears to

18    be what you are now arguing, since you said that Mr. Gilbert

19    and Mr. Cano-Flores had a discussion.  You've not indicated

20    what discussion or the extent of the discussion, but I

21    interpret what you said as some discussion regarding the

22    possibility that witnesses may lie during the trial.  Does that

23    mean that the Sixth Amendment does not afford the opportunity

24    to consult with his or her lawyer during the trial?

25         MS. SAHNI:  No, Your Honor.  But what I am saying is

1    that --

2            THE COURT:  What does it mean that -- what do you

3    mean, since you indicated that Mr. Gilbert said he had

4    discussed prior to trial Mr. Cano-Flores's belief that some of

5    the witnesses could lie?  That means that if I accept your

6    argument literally, it means that the government's proposition

7    is that during the course of a trial, it is constitutionally

8    permissible for the lawyer to simply nod, if there's been a

9    discussion prior to trial?

10           MS. SAHNI:  What I'm saying, Your Honor, is the

11   nature of the note should be taken into consideration.  Because

12   if it's just a note about a factual matter, that a witness was

13   lying, it didn't really require more than a nonverbal form of

14   communication for Mr. Gilbert, especially while another witness

15   was testifying.

16           THE COURT:  Does that mean, then, that the government

17   now contends that a defendant has no Sixth Amendment right to

18   confer with his or her lawyer during the trial regarding

19   avenues of cross-examination, merely because prior to trial the

20   defendant had expressed the concern that witnesses may testify

21   untruthfully?

22           MS. SAHNI:  No, Your Honor.  And I think it's

23   important to recognize that the defendant did have additional

24   out-of-court communication with other members of the defense

25   team.  And importantly --

1          THE COURT:  My question goes to during the trial.

2     That was the premise of my question.  I simply want to know

3     whether it is the argument of the United States that a

4     defendant has no Sixth Amendment right to communicate during

5     the trial with his lawyer concerning the defendant's concerns

6     that witnesses -- a witness, any witness, has testified

7     untruthfully?  Inasmuch as such a concern, we would think, is

8     of great relevance to the lawyer's preparation for cross-

9     examination.

10          MS. SAHNI:  No, Your Honor.  And here the defendant

11     did have the opportunity to express his opinions and concerns

12     about the cross-examination through Mr. Gilbert in the form of

13     notes, as well as in his trial journal to Miss Hughes.

14          THE COURT:  And do you acknowledge, Ms. Sahni, that

15     while the record reflects the instances in which

16     Mr. Cano-Flores gave Mr. Gilbert a note, the record does not

17     reflect -- and, indeed, the testimony of Mr. Gilbert is to the

18     contrary -- any response by Mr. Gilbert to the note, other than

19     a nod?

20          MS. SAHNI:  I apologize, Your Honor.  Would you mind

21     repeating the question, please?  I'm not sure I fully

22     understood.

23          THE COURT:  I will rephrase it.  You acknowledge that

24     the record -- you acknowledge that Mr. Gilbert never passed a

25     note in return?

1          MS. SAHNI:  Your Honor, I believe that Mr. Gilbert's

2    declaration --

3          THE COURT:  My question is:  Do you acknowledge that

4    there is no evidence that Mr. Gilbert ever passed a note in

5    return?

6          MS. SAHNI:  I do not believe that there was testimony

7    that he wrote a note back, Your Honor.

8          THE COURT:  Do you acknowledge that Mr. Gilbert never

9    asked for any recess so that he could speak to Mr. Cano-Flores

10   about any note?

11         MS. SAHNI:  I do not believe there was any testimony

12   to that effect, Your Honor.

13         THE COURT:  Do you acknowledge that Mr. Gilbert did

14   not, for example, at lunchtime go to the cellblock to speak to

15   Mr. Cano-Flores about any note?

16         MS. SAHNI:  Yes, Your Honor.

17         THE COURT:  Do you acknowledge that Mr. Gilbert did

18   not say that he ever asked for the assistance of Miss Salazar

19   or any other interpreter who may have been present to translate

20   any note?

21         MS. SAHNI:  I do not believe they asked the court

22   interpreter to specifically --

23         THE COURT:  Well, did you?

24         MS. SAHNI:  I'm sorry?

25         THE COURT:  By "they," I assume you mean Ms. West.

1    Did you ask Mr. Gilbert whether he enlisted the assistance of

2    the interpreter who was present to translate any note?

3            MS. SAHNI:  No, I did not.

4            THE COURT:  So can we agree, then, that at least as

5    to the passage that you read from the November 29th transcript,

6    that Mr. Gilbert's response to his client's note was to nod?

7            MS. SAHNI:  Yes.

8            THE COURT:  Now, let me ask you to move on, please,

9    to December 3rd.  You indicated that there was testimony taken

10   on December 3rd, 2018, which appears at page 89, on which you

11   also rely.

12           MS. SAHNI:  Court's indulgence.  I'm just looking for

13   the exact line.

14           Your Honor, this is Miss Hughes testimony and I'm

15   actually looking at page 88, line 23.

16           THE COURT:  Thank you.  You may proceed.

17           MS. SAHNI:  At line 23 Miss Hughes says, referring to

18   a note, "I didn't see it go to him, but I have him unfolding a

19   piece of paper" -- referring to Mr. Gilbert -- "looking at it,

20   nodding at Mr. Cano-Flores and putting it in his pocket."

21           The court would -- I'm sorry, the government would

22   also point out that Mr. Gilbert did meet with the defendant one

23   time at the jail, on President's Day, which was February 18,

24   2013, during the trial period.  And that's the one meeting that

25   occurred during the examination of the witnesses.

1          THE COURT:  Is it the case, Ms. Sahni, that the

2     government relies on testimony from Mr. -- I'm sorry, testimony

3     on November 29th, 2018 and again on December 3rd 2018 for the

4     proposition that Mr. Cano-Flores was able to communicate with

5     his lawyer during the course of the trial?  Are those the two

6     citations on which you rely?

7          MS. SAHNI:  With respect to in-the-courtroom

8     communications with Mr. Gilbert specifically, yes.

9          THE COURT:  Do you rely exclusively on page 46 of the

10    November 29th, 2018 transcript and page 88 of the December 3rd,

11    2018 transcript for the proposition that during the trial

12    Mr. Cano-Flores was able to communicate with his lawyer,

13    Mr. Gilbert?  Communicate effectively.

14          MS. SAHNI:  In the courtroom, yes, Your Honor.

15          THE COURT:  Very well.  Thank you, Ms. Sahni.

16          Ms. Sahni, does that complete your argument?

17          MS. SAHNI:  Your Honor, if I may briefly address

18    *Torres*, as well, since you've asked us to do that.

19          THE COURT:  Please.

20          MS. SAHNI:  In certain respects *Torres* is different

21    from this case.  Here, the defendant did have an interpreter

22    who spoke his native language during client meetings.  And the

23    government is not arguing that the defendant could effectively

24    communicate in English.  But the case is important for our case

25    in several ways.

1     First, it shows that it is the defendant's burden to

2     show exactly how he could not communicate with his counsel when

3     he is arguing that a language barrier prevented him from

4     effectively communicating with counsel.

5          *Torres* also --

6          THE COURT:  Didn't the Court indicate that it wasn't

7     going to decide that issue, since there was no evidence that

8     Mr. Torres was unable to communicate in English?  Put another

9     way, have you accurately characterized what the Court held?

10         MS. SAHNI:  Your Honor, in the line that Your Honor

11    read, the Court says the defendant has --

12         THE COURT:  I did not read the holding.  My question

13    is:  Did you accurately characterize what the Court held?

14         MS. SAHNI:  I apologize if I misspoke with the word

15    "held."  But, the case does, in the line that Your Honor read,

16    indicate that the defendant failed to demonstrate that his

17    English language ability was inadequate, which indicates that

18    it was the defendant's burden there.

19         THE COURT:  Would you answer the passage that the

20    Court -- to which the Court directed counsel's attention, we

21    all recognize was not the holding.  My question to you is

22    whether you accurately characterized the Court's holding just a

23    moment ago?

24         MS. SAHNI:  And, Your Honor, I was not intending to

25    restate the Court's holding.  I apologize if that's how it came

 1    across.

 2            THE COURT:  Very well.  Does that complete your

 3    argument, Ms. Sahni?

 4            MS. SAHNI:  Your Honor, the government would just

 5    also highlight that it's important to consider the efforts of

 6    both Mr. Gilbert and Miss Hughes in communicating with the

 7    defendant.

 8            THE COURT:  Are you speaking of in court, during the

 9    trial, or at some other time?

10            MS. SAHNI:  In all of the representation of the

11    defendant, both before trial, during the court proceedings, and

12    at the jail during -- at night during the trial period --

13    because all of that should be considered in determining whether

14    defense counsel effectively communicated with Mr. Cano-Flores

15    about his trial and whether they were prepared for trial --

16    whether Mr. Cano-Flores was able to meaningfully contribute his

17    thoughts and comments about what was going on in trial, whether

18    that information was communicated to Mr. Gilbert so that he

19    could incorporate that information --

20            THE COURT:  Are you suggesting that this -- is the

21    United States now suggesting that the Sixth Amendment

22    requirement is that a defendant be able to communicate his

23    thoughts to his lawyer?  I believe that is what you just said.

24            MS. SAHNI:  The defendant has a right to meaningfully

25    participate in his own defense, which could include his

1    thoughts about what's going on with his case or at trial to his

2    counsel.  So, in that respect, yes.

3              THE COURT:  Very well.  Thank you, Ms. Sahni.

4              Ms. West, I will hear your reply.

5              THE INTERPRETER:  Your Honor, may the interpreter

6    have a brief break?  I'm running out of paper.  I need to run

7    downstairs.

8              THE COURT:  Yes.

9              We will go off-the-record for just one moment.  All

10   of you may remain.

11             (Recess.)

12             THE COURT:  Now we're back on the record.  I will

13   hear your reply, Ms. West.

14             MS. WEST:  Yes, Your Honor.  The Court indicated

15   interest in the 11-29 transcript, page 46.  And the

16   government's question to Mr. Gilbert was:  "Were you generally

17   able to read and understand the notes in Spanish?"

18             And Mr. Gilbert answered, "Yes."

19             I think the Court should, and can, question the

20   accuracy of Mr. Gilbert's response, based on what you've heard

21   from all the witnesses.  Specifically, because Mr. Gilbert,

22   although asked by me, never produced any notes.  Mr. Gilbert's

23   handwriting was not on the notebook that Mr. Cano-Flores used

24   to write notes in during trial.  In fact, in the 11-29

25   transcript, on page 61, Mr. Gilbert, when asked by me,

1    "Overall, how would you describe the communication between

2    yourself and defendant during trial?"  Lines 21 and 22.

3    Mr. Gilbert acknowledges, when he says, in answer to my

4    question in line 23, "During the trial itself it" -- meaning

5    his communication -- "was relatively sparse."

6              And page 115 was when I asked Mr. Gilbert if his

7    handwriting was on the notebook and he said, "No."

8              And on page 51, when asked -- when Mr. Gilbert is

9    asked about his communication, he indicates only that he

10   communicated regularly with Ms. Hughes.  And when Mr. Gilbert

11   says how he communicated with Miss Hughes, he indicates, in

12   line 13, he indicates, quote, By talking to each other, end

13   quote.

14             THE INTERPRETER:  The interpreter asks for

15   repetition, please.

16             MS. WEST:  I'm sorry?

17             THE INTERPRETER:  The interpreter would ask for a

18   repetition.

19             MS. WEST:  In line 13, the way Mr. Gilbert indicates

20   the way he communicated with Miss Hughes was, quote, By talking

21   to each other, end quote.

22             And in lines 14 to 16, on page 51, he indicates the

23   way and when he would indicate -- or, communicate with Miss

24   Hughes was at lunch and during breaks during the trial.

25             So the Court has before it communication between the

1    lawyers, but no communication between Mr. Gilbert and

2    Mr. Cano-Flores, which is what the Sixth Amendment requires.

3         And on 11-27, page 99, line 22 through 25 -- I'm

4    sorry 26, page 100, I asked Mr. Gilbert where it was that he

5    talked to Mr. Cano-Flores about his concerns and ask

6    specifically when did that happen?

7         And Mr. Gilbert answers me, quote, on line 24, I did

8    not talk to Mr. Cano-Flores about his concerns in the middle of

9    trial, other than when, I think, I went to see him once or

10   twice.  And on page 100, line 5, when I asked Mr. Gilbert why

11   he would not talk to Mr. Cano-Flores about his concerns, in

12   line 7 he answered me, "Because that has to do with my plan for

13   the trial that was agreed upon well in advance."  And what

14   Mr. Gilbert meant by "in advance" was in advance of trial.

15        So, we submit to this Court that there are no notes

16   that were read by Mr. Gilbert, and if there were notes, they

17   were never answered.  And, therefore, his representation

18   constitutionally fails.  Because Mr. Gilbert thought --

19        THE COURT:  Ms. West, I apologize.  Before you go on,

20   just so we have a clear record, when you say, quote, there are

21   no notes, you mean that Mr. Gilbert, in response to your

22   request that he do so, did not produce any?

23        MS. WEST:  Correct.  And so what this Court has

24   before it is nobody is talking to Mr. Cano-Flores in the trial.

25   Thank you.

 1          THE COURT:  Counsel, thank you very much.  The Court

 2  will continue the process of evaluating your arguments in the

 3  context of the evidence adduced during the evidentiary hearing.

 4          Ms. Salazar, we thank you very much for your

 5  assistance.

 6          MS. WEST:  Can I speak before we go -- I'm sorry,

 7  Your Honor.  I just -- before he goes I want to talk to him, if

 8  that's possible.

 9          THE COURT:  You may, as long as the institution is

10  able to accommodate you.

11          We will recess at this time.  All of us will leave

12  the courtroom.

13          MS. WEST:  Thank you, Your Honor.

14          THE COURT:  Is there anything further on behalf of

15  the United States?

16          MR. RADOVICH:  No, Your Honor.

17          THE COURT:  Very well.  Thank you very much,

18  Mr. Radovich.

19          That concludes the oral argument.  I thank all of

20  you.

21          MS. SAHNI:  Thank you.

22                          *    *    *

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

    I, JANICE DICKMAN, do hereby certify that the above and

foregoing constitutes a true and accurate transcript of my

stenographic notes and is a full, true and complete transcript

of the proceedings to the best of my ability.

                        Dated this 21st day of November, 2019




                        _____

                        Janice E. Dickman, CRR, CMR, CCR
                        Official Court Reporter
                        Room 6523
                        333 Constitution Avenue, N.W.
                        Washington, D.C.  20001