**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AURELIO CANO-FLORES,<br>Defendant/Petitioner. | Criminal No. 08-CR-57-16<br>BJR/DAR |

**REPORT AND RECOMMENDATION**

Pending for consideration by the undersigned United States Magistrate Judge is Defendant/ Petitioner ("Defendant") Aurelio Cano-Flores' Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (ECF No. 313), as supplemented by Defendant's Supplemental Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (ECF No. 350) (collectively, "Defendant's § 2255 Motion"). Defendant alleges ineffective assistance of trial counsel and asks that the Court vacate his conviction. Defendant's § 2255 Motion (ECF No. 350) at 1. The trial court referred this matter to the undersigned for report and recommendation. *See* 10/31/2017 Minute Order.

For a period of nearly two years, the undersigned conducted status hearings and an evidentiary hearing, heard the oral arguments of counsel with respect to all of the issues presented, and reviewed the memoranda of law filed by the parties in accordance with the undersigned's instruction. During the course of the undersigned's consideration of this extensive record, the undersigned identified the issue of counsel's failure to communicate with Defendant during the trial as the dispositive issue. For the reasons discussed in detailed herein, the

undersigned finds that prejudice must be presumed.[1] Thus, the undersigned will recommend that Defendant's motion be granted.

## BACKGROUND

### *Defendant's Trial*

In September of 2012, Defendant was charged with one count of conspiracy to manufacture and distribute five kilograms or more of cocaine and 1,000 kilograms or more of marijuana for importation into the United States, in violation of 21 U.S.C. §§ 959, 960, and 963. *See* Superseding Indictment (ECF No. 61). Defendant, who solely speaks Spanish, initially retained Dennis Ramirez, Esq. as counsel. *See* 09/08/2011 Minute Order; Tr. 12/4/18 at 46. However, the Court (Kollar-Kotelly, J.) appointed Heather Shaner, Esq. as interim counsel until Mr. Ramirez entered his appearance. *See* 09/12/2011 Minute Order. However, Mr. Ramirez never entered his appearance, and subsequently, Defendant retained Richard Gilbert, Esq., as counsel. Entry of Appearance (ECF No. 34). A year later, the Court appointed Mr. Gilbert as counsel for the Defendant under the Criminal Justice Act ("CJA"). 08/06/2012 Minute Order. Due to "the complexity" of Defendant's case, the Court also appointed Kristen Grim Hughes, Esq., "to assist with the defense[.]" Order (ECF No. 46).

Neither, Mr. Gilbert nor Ms. Hughes, claimed to be bilingual, or to have any fluency in Spanish.[2] Mr. Gilbert testified that he did not "feel comfortable having substantive legal conversations" with Defendant, and Ms. Hughes testified that she does not speak Spanish. Tr. 11/27/18 at 125; Tr. 11/28/18 at 103. Mr. Gilbert "hired" Miriam Valencia to serve as a

[1] The undersigned thus undertakes no consideration herein of the remaining issues presented.

[2] Mr. Gilbert, in his motion for leave for him and Ms. Hughes to withdraw as counsel, stated that he "speaks Spanish only on a conversational level[.]" Motion To Withdraw as Counsel (ECF No. 306) at 1.

translator. Tr. 11/29/18 at 7. Ms. Valencia, who was not court-certified, previously worked with Mr. Gilbert on prior cases and usually accompanied him and Ms. Hughes when they visited Defendant at the jail. Tr. 11/27/18 at 61; Tr. 11/29/18 at 7, 12. Ms. Valencia was not present during the trial nor was any interpreter present at counsel table during the trial to enable defendant to communicate with his counsel.[3] Tr. 12/04/18 at 66.

Defendant's trial commenced on February 11, 2013 and concluded on February 26, 2013. *See* 02/11/2013 Minute Entry; 02/26/2013 Minute Entry. Both Mr. Gilbert and Ms. Hughes were present at counsel table during the trial. Tr. 11/29/18 at 51. As their sole means of communication during the proceeding, Ms. Hughes gave Defendant sheets of paper which she characterized as Defendant's "journal or notebook." Tr. 11/28/18 at 117. Ms. Hughes instructed Defendant to write the word "ojo" — "eyes" in Spanish — next to anything he wanted Ms. Hughes to review. Tr. 11/28/18 at 118, 121, 138. Ms. Hughes collected and reviewed the papers after court each day and "compared" Defendant's notes to her notes to determine the "subject matter." Tr. 11/28/18 at 119, 151. On some occasions, Defendant passed a note to Mr. Gilbert, who accepted it and nodded, but did not discuss it with Defendant during the court proceedings. Tr. 11/28/18 at 121.

Ultimately, the jury found Defendant guilty of the charged offense. *See* Verdict (ECF No. 129). The trial court sentenced Defendant to a term of incarceration of 420 months' imprisonment, and a term of supervised release of sixty months. *See* Judgment (ECF No. 172). The trial court also ordered that Defendant forfeit the sum of $15,000,000,000 to the United States. *Id.*

[3] A certified court interpreter was present throughout the trial.

Defendant appealed his conviction. On August 7, 2015, the United States Court of Appeals for the District of Columbia Circuit affirmed Defendant's conviction but remanded the case to the District Court to determine the appropriate forfeiture amount. *See United States v. Cano-Flores*, 796 F.3d 83 (D.C. Cir. 2015). Upon remand, the trial court reduced the forfeiture amount to $21,600,000. *See* Final Order of Forfeiture (ECF No. 311). Thereafter, Defendant filed a petition for writ of certiorari, which the United States Supreme Court denied. *See United States v. Cano-Flores*, __ U.S. __, 136 S.Ct. 1688 (2016).

On March 9, 2017, Defendant, then proceeding *pro se*, filed his motion for relief pursuant to 28 U.S.C. § 2255, alleging that "there was ineffective communication during the pre-trial stage regarding the theory of defense[,]" and the issue was "compounded during trial" when the government's witnesses "either fabricated portions of their testimony or made erroneous statements" and his "counsel was not able to understand [his] objections and/or suggestions on cross-examination" due to the language barrier between them. Defendant's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 Motion at 5. On October 31, 2017, the trial court appointed counsel to represent Defendant, and referred this matter to the undersigned for report and recommendation. Thereafter, counsel for Defendant filed a supplement to the motion, and requested an evidentiary hearing. Defendant's Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 at 1.

***Evidentiary Hearing***

The undersigned conducted an evidentiary hearing, which commenced on November 27, 2018 and concluded on December 6, 2018. During the six-day evidentiary hearing, testimony was taken from Eddy Colindres, court-appointed investigator for Defendant's counsel; Mr.

Gilbert; Marta Goldstein, a Certified Spanish Interpreter qualified as an expert witness; Ms. Hughes, and Defendant.[4] The undersigned received into evidence a total of fifty-one exhibits. *See* Exhibit Lists (ECF Nos. 366, 367).

The undersigned heard extensive testimony with respect to all of the issues presented in Defendant's Section 2255 Motion. However, for the purposes of this report and recommendation, the undersigned recounts, in relevant part, the testimony of Mr. Gilbert, Ms. Hughes, Ms. Goldstein, and Defendant as it relates to the communication, or lack thereof, between counsel and Defendant.[5]

Mr. Gilbert's Testimony

Mr. Gilbert testified that he had a "conversational" level of Spanish, which he explained meant that he "was able to carry on conversations with people in Spanish[]"; however, he did not "feel comfortable having substantive legal conversations" with Defendant, which was his reason for hiring an interpreter. Tr. 11/29/18 at 6-7. Mr. Gilbert indicated that he used Ms. Valencia, rather than a court-certified interpreter, because of the flexibility of her schedule to go with him to the jail when he visited Defendant. Tr. 11/29/18 at 7, 9-10. He stated that he visited Defendant about thirty-two times prior to trial. *Id*. at 56. During the pretrial meetings with Defendant, Mr. Gilbert explained the trial process, jury selection, and their defense strategy. *Id*.

[4] Ms. Valencia was unavailable to testify. Counsel for Defendant indicated that she attempted to serve Ms. Valencia at her place of residence in Maryland but to no avail. *See* Tr. 11/27/18 at 5 ("And Ms. Valencia, unfortunately, has avoided service of process and is unavailable at this time to testify."). Counsel for Defendant stated that her investigator spoke with Ms. Valencia in July 2018 and informed him that she would be visiting Colombia, her home country, but would return to Maryland in August 2018. *Id*. Counsel for the United States stated that Ms. Valencia was in fact in Colombia, but no one had her contact information. *Id*. at 12.

[5] *See supra* n.1. For this reason, the undersigned omits any further reference to Mr. Colindres, whose testimony largely concerned investigative measures for obtaining cellphone records and his interactions with Ms. Valencia on unrelated matters.

at 20. Mr. Gilbert advised Defendant that he did not have an affirmative defense and that the trial strategy would be to create reasonable doubt. *Id*. at 22-23.

Mr. Gilbert testified that during the week of trial, he regularly communicated with Ms. Hughes. *Id*. at 51. Mr. Gilbert testified that whenever Ms. Hughes or Ms. Valencia visited Defendant at the jail during trial, Ms. Hughes discussed any concerns Defendant presented to them with him on the following morning.[6] *Id*. at 61; Tr. 11/27/18 at 97. Mr. Gilbert explained that his discussions with Ms. Hughes "did not affect what [he] was going to do at trial." Tr. 11/27/18 at 99. Mr. Gilbert testified that "if" there was something to incorporate, then he would have "incorporated it in [his] cross-examination[]"; however, "for the most part, there was no [information] to incorporate into [his] cross-examination." *Id*. Ms. Hughes was present with Defendant at the defense table during the trial while Mr. Gilbert was at the podium conducting cross-examinations. Tr. 11/29/18 at 51. Mr. Gilbert testified that if "something could be made of" the issues Defendant presented to Ms. Hughes, then he would have considered raising such issues. *Id*. at 52.

However, Mr. Gilbert testified that his actual conversations with Defendant "[d]uring the trial itself" were "relatively sparse." *Id*. at 61. Mr. Gilbert stated he "did not talk to [Defendant] about his concerns in the middle of trial other than" when he visited Defendant at the jail on February 11, 2013 and February 18, 2013. Tr. 11/27/18 at 99-100; Tr. 11/29/18 at 56. Mr. Gilbert explained that he and Defendant had agreed "well in advance" to his plan for the trial. *Id*. at 100. Mr. Gilbert further explained that when he visited Defendant on February 11, 2013, he "reiterated what our plan was." Tr. 11/29/18 at 106. Mr. Gilbert testified that when

[6] Mr. Gilbert testified that Ms. Valencia wrote Defendant's concerns in Spanish and then sent her notes to a Mr. Rafael Giraldo, hired to translate them, who then transcribed the notes in English. *Id.* According to Mr. Gilbert, Mr. Giraldo sent the transcribed notes to Ms. Hughes, and Ms. Hughes spoke with Mr. Gilbert the following morning prior to the beginning of trial. *Id.*

Defendant wanted to communicate with him directly, Defendant would communicate in writing and "slide his notes over so that I could see them." *Id*. at 46. Although the notes were in Spanish, Mr. Gilbert said that he was able to understand it and he would either look at Defendant or nod at him to indicate that he had seen the note. *Id*. Mr. Gilbert explained that he typically did not want anyone talking to him while witnesses were testifying because he wanted to pay attention to the testimony. *Id*. at 47. Instead, he would review the notes during "a pause" in the proceeding, or when a witness completed his or her testimony. *Id*. Mr. Gilbert stated that the general nature of Defendant's notes were comments regarding witness testimony that Defendant believed to be untrue. *Id*. at 50. Mr. Gilbert indicated that he was already prepared and aware of which testimony Defendant would be concerned about due to their prior conversations regarding the government witnesses.[7] *Id*. at 59. Mr. Gilbert also indicated that he spoke to Defendant occasionally during breaks in the proceedings and, when necessary, had the courtroom interpreters to interpret for him. *Id.* at 54. However, Mr. Gilbert acknowledged that he did not write Defendant any notes during the trial proceedings. Tr. 11/27/ 18 at 103. Mr. Gilbert also

[7] Mr. Gilbert offered the following answers to questions posed by counsel for the United States:

> Q: Do you believe that more jail visits during the trial period would have been necessary in this case?
> A: No.
> Q: Why not?
> A: Because – we had a plan. We talked about a theory of defense; we had our strategy. I told him what my tactical plan was. We adhered to that plan. We had been over the information, what he could tell us about what the Government witnesses were going to say. And it pretty much unfolded that way. If there had been something really dramatic that changed what we had been preparing, I would have gone over to see him that night, that would have been important enough. But to my knowledge – I don't know what he's said – when he will have a chance to testify but, to my knowledge, there was nothing like that that came out.

*Id*. at 59.

acknowledged that he never communicated with Defendant before court, during the lunch break, or after court proceedings.[8] *Id*. at 104.

Notably, Mr. Gilbert was asked why he did not ask Ms. Valencia to "help communicate" with Defendant during the trial. *Id*. at 108. Mr. Gilbert stated:

> I wasn't going to talk with Mr. Cano-Flores about significant substantive matters. I mean, we don't – you know, the marshals have him under control right? So they take him down for lunch. We could have gone down to see him at lunch, but we didn't; we worked during lunch.

*Id*.

<u>Ms. Hughes' Testimony</u>

Ms. Hughes acknowledged that whenever Defendant wanted to get her attention during the trial that he would write "ojo" next to the notes he took on the papers she gave him. Tr. 11/28/18 at 118. Ms. Hughes reviewed the notes with "ojo" at the end of the day or during a lunch break. *Id*. at 149. Ms. Hughes indicated that she did not recall exchanging words with Defendant while a witness was on the stand or while "a lawyer was speaking." *Id*. at 138. She stated that she visited Defendant "several times at the jail" during the week of trial. *Id*. at 158. During those visits, Ms. Hughes discussed Defendant's concerns while Ms. Valencia assisted in interpreting for her. *Id*.

---

[8] Mr. Gilbert offered the following answers to questions posed by counsel for Defendant:

> Q: You never communicated with Mr. Cano-Flores before court, did you?
> A: No.
> Q: You never communicated with him over the lunch hour?
> A: No.
> Q: You never communicated with him after court?
> A: True.

*Id.* at 104.

Regarding Defendant's communication with Mr. Gilbert, Ms. Hughes testified that Defendant wrote notes to Mr. Gilbert, and that Mr. Gilbert read the notes, nodded at Defendant and placed the notes in his pocket. *Id*. at 121-22. She stated that there were times when Mr. Gilbert and Defendant would exchange words during the breaks; however, most of the communication that occurred during the exchange was not substantive. *Id*. at 122. Instead, "[i]t would be more like, 'are you doing okay? Or, what about this? What about that?'" *Id*. Ms. Hughes was asked to explain how Defendant would inform Mr. Gilbert during the trial that a witness was lying. Ms. Hughes' response was, "Well, in most cases, Mr. Gilbert knew it because we had already gone through those. We knew what [the witness] was going to say." *Id*. at 118.

Defendant's Testimony

Defendant testified that at the outset of trial, he asked Ms. Valencia to attend and translate for him. Tr. 12/04/18 at 66. More specifically, after the second day of trial, Defendant asked Ms. Valencia to sit next to him at trial so that he could "pay close attention and listen to everything, and she would be there in case anything came up." *Id*. However, Ms. Valencia informed him that she could not come. *Id*. When Defendant was asked why he needed Ms. Valencia to translate for him at trial, he stated:

> Because I wanted to be able to communicate with the attorney when I was seeing everything that was going on during the trial and I was listening to the witnesses on the stand. I wanted to let him know what he could say in response to things that they were saying. Because they were talking about things that happened in Mexico, and he didn't know anything about Mexico. But – and so I wanted someone next to me so that I could have communication with them.

*Id*. at 66-67. Defendant testified that while in court, he was unable to communicate with Mr. Gilbert. Defendant stated that he tried to get Mr. Gilbert's attention by touching him or by trying

to say something to him. *Id*. at 71. For example, Defendant stated that he tried to get Mr. Gilbert's attention and pointed to his notebook; however, in response, Mr. Gilbert "just said okay, okay." *Id*. at 71-72. Defendant stated:

> And so I realized that I was not going to be able to communicate with the gentleman like that, and so I could not tell him what was happening there. So, I continued to take notes, and writing and writing because I couldn't communicate with him.

*Id*. at 72. Defendant explained what he attempted to do if he thought a witness was lying while testifying:

> I would write everything. I tried to talk to the attorney, but there was just no communication between us. I wanted to tell him what was wrong so that when they were on the stand so that he would then be able to ask them questions and try to get at the truth.

*Id*. at 82.

Defendant also testified that he could not communicate with Ms. Hughes either because she, like Mr. Gilbert, did not speak Spanish. *Id*. at 74. Defendant acknowledged that the "ojo system" was created prior to trial as a means of communication but stated, more specifically, that "it was a way in which Ms. Valencia could tell [Mr. Gilbert] the information that I wanted to relay to him." *Id*. at 67. Defendant stated that he would underline certain information or add other markings to point out that the notes were important or that he wanted to talk about the notes. *Id.* Defendant added, "[w]hat I would write in those notes, it would be so that, when I went back to the jail, I could tell Ms. Valencia what I wanted her to relay to the attorney." *Id*. at 68. Defendant explained that while he was in trial, he would take notes and at the end of the day he would "hand them over to Mr. [Gilbert]." *Id*. He testified that Mr. Gilbert "would get them and send them over to the jail to me. I would arrive from here at about seven o'clock. Ms. Valencia would arrive at about 7:30 with the notes, and so that I could pinpoint to her what I

wanted her to relay to Mr. Gilbert."[9] *Id*. at 68-69. However, Defendant stated that Mr. Gilbert did not talk to him following any of Ms. Valencia's visits. *Id.* at 80.

Ms. Goldstein's Testimony

In relevant part, Ms. Goldstein testified regarding the need for an interpreter to facilitate communication between a defendant and defendant's counsel during trial where defendant's counsel is not fluent in the language spoken by the defendant. Ms. Goldstein offered the following response to an introductory question posed by counsel for Defendant:

> Q: Why would an accused need someone to translate their language for them during a trial?
> A: Many times I have heard people say, well, the person speaks English, or a little bit. Well, a little bit of English is not enough in a court of law. Most Americans have a tough time in a court of law to even understand the legal language of the courts, much less a foreign speaker who does not—who is not proficient in the English language.

Tr. 11/27/18 at 138. Ms. Goldstein also opined regarding the importance of the presence of an interpreter for attorney-client communications:

> Q: Would it be advisable to have an interpreter in a case where the defendant speaks only Spanish and the defense lawyer only speaks English—would you need an interpreter?
> A: Yes.
> Q: Why?
> A: Because there is no other way for them to communicate during trial, which is the defendant's right.

*Id.* at 143-44.[10]

[9] Defendant testified that during the week of his trial Ms. Valencia visited him each day at the jail, Mr. Gilbert visited him twice, Ms. Hughes visited him "[m]aybe once or twice." *Id*. at 69-70.

[10] Defendant offered Ms. Goldstein as an expert witness, and the undersigned received her as an expert without objection from counsel for the government. Tr. 11/27/18 at 137. Counsel for the government did not undertake any cross-examination of Ms. Goldstein regarding the two questions and answers quoted in the text above.

***Post-Hearing Proceedings***

Following the six-day evidentiary hearing, the parties filed their proposed findings of fact and conclusions of law with regard to Defendant's pending § 2255 Motion. *See* Defendant's Proposed Findings of Fact and Conclusions of Law (ECF No. 388); Government's Proposed Findings of Fact and Conclusions of Law (ECF No. 390); Defendant's Reply to the Government's Proposed Findings of Fact and Conclusions of Law (ECF No. 411).

In August 2019, the undersigned ordered both Defendant and the United States to address the following issue:

> [T]o what extent should prejudice be presumed with respect to (1) the inability and unavailability of Richard K. Gilbert, Esq., counsel of record, to communicated with Defendant both prior to and during trial, and (2) the failure of Mr. Gilbert to even attempt to communication with Defendant during the two-week trial, save a single visit at the District of Columbia jail? *See Garza v. Idaho*, ___ U.S. ___, 139 S.Ct. 738 (2019); *United States v. Ragin*, 820 F.3d 609 (4th Cir. 2016).

08/05/2019 Order (ECF No. 405). Thereafter, the parties filed supplemental briefing in accordance with the undersigned's order. *See* Government's Memorandum of Law in Response to Court Order (ECF No. 413); Defendant's Brief Regarding Presumed Prejudice in light of Garza v. Idaho (ECF No. 415). On October 9, 2019, the undersigned heard oral argument of counsel with respect to the supplemental briefing. *See* 10/09/2019 Minute Entry.

**THE PARTIES' CONTENTIONS[11]**

***Defendant's Contentions***

[11] The undersigned limits the summary of the parties' contentions to those which relate to the single dispositive issue. *See supra* n.1.

Defendant's motion is predicated upon his claim of ineffective assistance of trial counsel. With respect to the single dispositive issue, Defendant submits that

> Mr. Gilbert, who did not speak the Spanish language, went to trial with a client who only spoke the Spanish language, without a translator at the table to assist him so that he could communicate with Mr. Cano-Flores[.]

Defendant's § 2255 Motion (No. ECF 350) at 4; *see also* Defendant's § 2255 Motion (No. ECF 313) at 5 ("The problem [of ineffective communication during the pre-trial stage] was compounded during trial . . . [because] [m]y counsel was not able to understand my objections and/or suggestions on cross-examination, because of the language barrier."). Defendant contends that the notes he passed to Mr. Gilbert during the trial "were never considered nor answered." *Id*. at 8. Defendant observes that trial counsel "failed to provide any translator to facilitate communication with [him] while [the] trial was in progress." *Id*. at 18. Defendant further observes that "[n]owhere in the trial transcripts does Mr. Gilbert ask for time to confer with his client or with an interpreter." *Id*. at 8. Defendant also argues that trial counsel only visited him once outside of the courtroom. *Id*. at 4, 8, 18. Defendant, in sum, argues that "Mr. Gilbert's failure to meet personally with [him] during trial and to ensure that [he] had the means to communicate directly with him, in real time, while witnesses were testifying, further denied Mr. Cano-Flores's right to consult with his attorney in a meaningful way." *Id*. at 18.

Defendant, relying upon *Geders v. United States*, 425 U.S. 80, 88 (1976), submits that "[t]he right to effective assistance of counsel includes, in particular, the right to confer substantially with counsel during trial." Defendant's Findings of Fact and Conclusions of Law at 30. Defendant, in his initial post-hearing written submission, maintained that Mr. Gilbert's failure to confer with him affected the outcome of the trial and prejudiced him. *Id*. at 36. At that time, Defendant noted that the District of Columbia Circuit "has discussed the peculiar difficulty

associated with proving prejudice in a case which the defendant was deprived of the effective assistance of counsel through a lack of communication between attorney and client." *Id*. at 39; *see also id*. at 40-41.

However, in response to the undersigned's order directing the parties to address the issue of whether, in the context of the evidence presented here, prejudice should be presumed, Defendant argues that prejudice must be presumed. More specifically, Defendant submits that the evidence here establishes that he was denied counsel at a critical stage, thereby "prevent[ing] the trial from reliably serv[ing] its function as a vehicle for determination of guilt or innocence." Defendant's Brief Regarding Presumed Prejudice in light of Garza v. Idaho (ECF No. 415) at 8-9 (quoting *United States v. Ragin*, 820 F.3d 609, 618 (4th Cir. 2016)) (internal citation and quotation marks omitted).[12] Defendant concludes that in this circumstance "automatic reversal without any inquiry into the existence of actual prejudice[]" is required. *Id*. at 9.

***The Government's Contentions***

Counsel for the government, in the government initial post-hearing memorandum, maintains that "[t]he Defendant . . . was afforded ample opportunity to participate in his own defense at trial." The Government's Proposed Findings of Fact and Conclusions of Law at 30. More broadly, the government submits that "[t]he Defendant has not met his burden to establish

[12] During oral argument, with respect to the parties' responses to the undersigned's order, counsel for Defendant argued:

> The confrontation clause requires that Mr. Cano-Flores have effectively cross-examined witnesses on his behalf. In other words, pretrial preparation and the use of a notebook during trial is not enough because that is not effective communication with your lawyer such that you can specifically cross-examine a witness on such things, such as bias and prejudice, which is why the Supreme Court reversed the conviction in Davis-versus-Alaska.

Tr. 10/09/19 at 8.

that his defense counsel were deficient in fulfilling their duty to consult and keep the Defendant informed or that his trial was fundamentally unfair as a result of his perceived challenges communicating with counsel."[13] *Id*. at 32.

In response to the undersigned's order directing the parties to address the issue of whether, in the context of the evidence presented here, prejudice should be presumed, the government submits that "[t]he Court should not presume any prejudice in assessing the Defendant's Supplemental Motion because the defense team's representation of the Defendant far exceeded the narrow set of circumstances in which a presumption applies." Memorandum of Law in Response to Court Order at 1. The government submits that in the context of a claim of ineffective assistance of counsel, the presumption of prejudice is "'reserved for situations in which counsel has entirely failed to function as the client's advocate.'" *Id.* at 8 (quoting *Florida v. Nixon*, 543 U.S. 175, 189 (2004)); *see also id*. at 14-15.[14] The government reiterates its argument that Defendant has failed to demonstrate actual prejudice. *Id*. at 9, n.7.

## APPLICABLE AUTHORITIES

*Section 2255*

---

[13] The government argues that "Mr. Gilbert established a reliable system for communicating with his client during trial—that is, by writing notes to each other" and that "Mr. Gilbert had little trouble reading and understanding the Defendant's notes." Government's Response to Defendant's Section 2255 Motion at 11. The government maintains that "Mr. Gilbert attests that he acknowledged the notes by nodding or writing notes back to the Defendant in Spanish[.]" *Id*. The government further asserts that "[i]n the limited instances when Mr. Gilbert needed assistance in translating complicated information to the Defendant, Mr. Gilbert obtained the assistance of a courtroom interpreter to translate during breaks in the court proceedings." *Id.* at 12. However, no such evidence was adduced during the evidentiary hearing.

[14] During oral argument, with respect to the parties' responses to the undersigned's order, counsel for the government claimed that "[t]he defendant has not proven and cannot prove that his defense counsel's representation was so deficient that it effectively amounted to no representation at all." Tr. 10/09/19 at 16. Additionally, counsel for the government argued that open "[t]he real world situation is that Mr. Gilbert's reading the note and nodding to acknowledge that he had read and understood the note was a form of communication that was appropriate for this type of note." *Id*. at 23.

Pursuant to 28 U.S.C. § 2255, a person in custody serving a sentence imposed by a federal court may file a motion to vacate, set aside or correct a sentence if he or she believes that such sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "The circumstances under which such a motion will be granted, however, are limited in light of the premium placed on the finality of judgments and the opportunities prisoners have to raise most of their objections during trial or on direct appeal." *United States v. Burwell*, 160 F. Supp. 3d 301, 308 (D.D.C. 2016). "The petitioner has the burden of proof to demonstrate his right to such relief by a preponderance of the evidence." *United States v. Edwards*, Civil Action No. 17-2778, 2019 WL 6219955, at *3 (D.D.C. Nov. 21, 2019). "With few exceptions, a prisoner may not raise a claim as part of a collateral attack if that claim could have been raised on direct appeal, unless he can demonstrate either: (1) 'cause' for his failure to do so and 'prejudice' as a result of the alleged violation, or (2) 'actual innocence' of the crime of which he was convicted." *Id.* at *4 (citing *Bousley v. United States*, 523 U.S. 614, 622-23 (1998)). However, "[w]here a petitioner raises claims of ineffective assistance of counsel in a § 2255 motion, he need not show 'cause and prejudice' . . . as these claims may properly be raised for the first time in a § 2255 motion." *Burwell*, 160 F. Supp. 3d at 308.[15]

*Ineffective Assistance of Counsel*

[15] At no time during the proceedings, which are the subject of the instant Report and Recommendation, did counsel for the government object to the inclusion in Defendant section 2255 motion of his claim of ineffective assistance of counsel. *See, e.g.*, Government's Response To Defendant's Section 2255 Motion (ECF No. 360).

An ineffective assistance of counsel claim is evaluated under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). As this Circuit has explained, *Strickland* requires the defendant to establish the following:

> First . . . that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed [to] the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*United States v. Gooch*, 842 F.3d 1274, 1279 (D.C. Cir. 2016) (quoting *Strickland*, 466 U.S. at 687). Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id*. at 691-92.

To demonstrate deficient performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness" or "prevailing professional norms." *Id*. at 688; *see also United States v. Novak*, 174 F. Supp. 3d 214, 216 (D.D.C. 2016) ("As to counsel's performance, the defendant must overcome a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' given the totality of the circumstances." (quoting *Strickland*, 466 U.S. at 689)). "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

To demonstrate sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 690. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Thus, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696.

However, there are certain Sixth Amendment contexts where prejudice is presumed. *See United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Court noted that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. "For example, no showing of prejudice is necessary if the accused is denied counsel at a critical stage of his trial[] or left entirely without the assistance of counsel on appeal." *Garza v. Idaho*, __ U.S. __, 139 S.Ct. 738, 744 (2019) (internal citations and quotations omitted). "Similarly, prejudice is presumed if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* Additionally, there are circumstances where "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic*, 466 U.S. at 659-60. Lastly, prejudice is presumed "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken." *Garza*, 139 S.Ct. at 744.

**DISCUSSION**

***Deficient Performance***

"'[T]he Sixth Amendment guarantees not just the right to have counsel, but also the right to consult with counsel about important tactical decisions,' [and] to participate in those decisions." *United States v. Bell*, 795 F.3d 88, 110 (D.C. Cir. 2015) (quoting *United States v. McLaughlin*, 164 F.3d 1, 17 (D.C. Cir. 1998) (Tatel, J., dissenting)). Representation of a criminal defendant entails the duty "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688. Importantly, "[o]ne of the defendant's primary advantages of being present at the trial [is] his ability to communicate with counsel." *Illinois v. Allen*, 397 U.S. 337, 344 (1970).

In *Geders v. United States*, the Supreme Court held that a trial court's order preventing a defendant from consulting with his counsel during a seventeen-hour overnight recess deprived the defendant of his right to the assistance of counsel guaranteed by the Sixth Amendment. 425 U.S. 80, 91 (1976). The Supreme Court observed that "the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance." *Id*. at 88. Moreover, the Court noted that a "defendant requires the guiding hand of counsel at every step in the proceedings against him." *Id.* at 89.

Subsequent decisions have liberally construed *Geders* and have found it applicable in contexts in which attorney-client communication was restricted during "one-hour lunch recess, and during brief, routine recesses in the trial day." *Mudd v. United States*, 798 F.2d 1509, 1511 (D.C. Cir. 1986) (internal citations omitted). Although the facts before the undersigned do not involve a trial court order restricting the communication between counsel and defendant, the

importance of a defendant having the ability to communicate with his counsel is still applicable. Moreover, it has been "recognized that this aspect of a defendant's Sixth Amendment right may be implicated if the defendant does not have sufficient English-language ability to understand and participate in the proceedings and is not provided a translator." *United States v. Torres*, 66 F. Supp. 2d 30, 36 (D.D.C. 1999).

The undersigned notes that this Court has, on one occasion, reviewed an ineffective assistance of counsel claim where the defendant, whose primary language was Spanish, alleged counsel's failure to retain an interpreter for lawyer-client communications outside of the courtroom denied the defendant meaningful participation in his defense. *Id*. at 31. In *United States v. Torres*, the defendant presented an expert witness to opine on his English-language abilities. *Id*. at 32. The expert stated that the defendant's level of proficiency fell below what would be required for the defendant to effectively communicate with a lawyer. *Id*. The expert opined that the defendant needed to be an intermediate-high level of proficiency to effectively communicate with a lawyer, and an advanced-high or superior level to understand the attorney's explanation of more abstract concepts such as guilty pleas or sentencing guidelines. *Id*. However, the government presented three witnesses that had interactions with the defendant, and all of the witnesses testified that they did not speak Spanish but interacted and communicated with the defendant in English. *Id.* at 32-35. Two of the witnesses stated that the defendant could speak some English and the defendant did not give any indication that he could not understand their conversations. *Id.*

In evaluating the evidence, this Court began its analysis by stating:

> This Court might be inclined . . . to hold that the reasonably effective assistance of counsel guaranteed by the Sixth Amendment includes out-of-court lawyer-client communication either directly in defendant's primary language or through an interpreter in the case

> of a defendant whose English-language ability is so low as to prohibit effective communication in English.

*Id*. at 36. However, the Court did not address this issue because the defendant "failed to demonstrate that his English-language ability was inadequate to permit effective communication between him and his attorney." *Id*. This Court explained that the testimony of the expert, taken together with other evidence in the case, was "simply not enough to carry the defendant's burden of establishing that his English-language ability was so inadequate as to render his communication with his counsel constitutionally defective." *Id*. Notably, the Court stated:

> Defendant, who has lived in the United States since 1972, was provided with an interpreter during all court proceedings in this case, at which the rapid pace of the proceedings could make communication and comprehension more difficult by making repetition, explanation, and nonverbal communication less practical. *The Court finds that his English-language ability, while far from perfect, was sufficient to permit meaningful communication with his counsel during the preparation of his defense*. Moreover, there is no indication in the record that he was ever denied the services of an interpreter; rather, he never requested such services for an out-of-court communication. The Court cannot find that the Constitution guaranteed more to this defendant."

*Id*. at 38 (emphasis added).

Thus, in determining whether counsel's actions, or inactions, constituted unreasonably deficient performance, the court's analysis was contingent upon whether the defendant had presented sufficient evidence to prove that he was unable to engage in "meaningful" or "effective" communication with counsel. *See id*. at 36 ("[D]efendant Torres has failed to demonstrate that his English-language ability was inadequate to permit effective communication."); *id*. at 38 ("[T]he evidence is simply insufficient to establish that Torres could not communicate with his counsel meaningfully and as . . . guaranteed by the Constitution.").

The undersigned observes that Defendant in the instant action was entirely unfamiliar with the intricate processes of the judicial system and the United States. Prior to his arrest, Defendant had never lived, worked, nor attend school in the United States. Tr. 12/04/18 at 46, 77. Defendant was born in Mexico and was living in Mexico at the time of his arrest. Tr. 12/04/18 at 46. Defendant testified that he was not familiar with the criminal justice system and that nobody explained it to him. *Id*. Additionally, it is an undisputed fact that Defendant solely speaks Spanish and does not speak nor understand English. Tr. 11/29/18 at 5-6. It is also an undisputed fact that neither Ms. Hughes nor Mr. Gilbert could communicate *substantive* matters to Defendant without the aid of an interpreter. Tr. 11/28/18 at 103-04; Tr. 11/29/18 at 7. The undersigned now turns to the underlying issue of whether Defendant has carried his burden of proving that he was unable to engage in "meaningful" and "effective" communication with counsel.

The undersigned finds, based on the evidence adduced at the evidentiary hearing, that counsel engaged in little to no communication with Defendant during his trial. It is undisputed that Defendant passed notes to Mr. Gilbert during the two-week trial conveying his concerns. Tr. 11/27/18 at 102-03; Tr. 11/29/18 at 46. Mr. Gilbert testified that he did not talk to defendant about his concerns in the middle of trial. *Id*. at 99-100. Mr. Gilbert acknowledged that Defendant occasionally wrote a note to him during the trial; however, Mr. Gilbert testified that he did not write a note in reply and did not preserve the notes which Defendant wrote. *Id*. at 103. Mr. Gilbert's only non-verbal communication with Defendant regarding Defendant's notes was a head-nod. *Id*.; Tr. 11/29/18 at 46. Additionally, Mr. Gilbert acknowledged that he never communicated with Defendant before court, during the lunch hour, or after court. *Id*. at 104.

Counsel for the government suggested that because Defendant did not alert the trial court that he could not communicate with Mr. Gilbert during trial, his present claim of failure to communicate should be rejected. *See* Government's Proposed Findings of Fact and Conclusions of Law at 31-32. However, Mr. Gilbert testified during the evidentiary hearing that he sought to limit such communication:

> What I tell them and what I told him was that while the witnesses are actually testifying, I didn't want him to disturb me—try to talk to me during those moments because it was important that I pay attention to what was actually being said in the courtroom.

*Id*. at 47. Moreover, it is undisputed that Defendant was unfamiliar with the criminal justice system in the United States to know that our Constitution guaranteed him the right to be able to confer with his counsel during trial regarding his concerns, and if he felt that he was unable to engage in effective communication to alert the trial court. Lastly, even Mr. Gilbert described the communication between the two as "relatively sparse" and "brief." *Id*. at 61.

The undersigned does not suggest that there must be a certain length or amount of time to communicate with a defendant, especially, if the conversation was substantive. However, in the instant matter and under the facts presented herein, the undersigned finds that any in-court communication that Mr. Gilbert did have with Defendant was not substantive. Mr. Gilbert testified that he did not feel comfortable having substantive legal conversations with Defendant and this was one of the reasons he hired an interpreter to assist in the case. Tr. 11/29/18 at 7. However, when he was asked why the interpreter did not attend the trial to continue assisting in the attorney-client communication, Mr. Gilbert responded, "I wasn't going to talk with Mr. Cano-Flores about significant substantive matters." Tr. 11/27/18 at 108. Additionally, Ms. Hughes testified that most of the communication that took place "was not substantive," but instead, would have been questions such as "are you doing okay." Tr. 11/28/18 at 122. Surely,

the Sixth Amendment guarantee of assistance of counsel encompasses an individual's right to communicate with counsel regarding substantive matters. The undersigned finds that Defendant did receive this guarantee. *See Ragin*, 820 F. 3d at 619 ("Effectiveness of counsel depends in part on the ability to confer with the client during trial on a continuous basis[.]").

In making this finding, the undersigned has considered the full extent of the evidence that was presented.[16] A defendant's ability to communicate with counsel during trial involves both counsel and the defendant engaging in a two-way conversation. It is clear to the undersigned that here, Defendant attempted to communicate with counsel during his trial, but he did not receive any responses regarding his concerns. A mere head-nod cannot be deemed as engaging in a meaningful conversation with a non-English speaking Defendant that was unfamiliar with the court process and needed the "guiding hand of counsel" while the trial was in-progress. *See Geders*, 425 U.S. at 88 ("Our cases recognize that the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance."). Accordingly, counsel's failure to effectively and meaningfully communicate with Defendant during his trial was a violation of Defendant's Sixth Amendment right to effective assistance of counsel.

***Prejudice***

The undersigned observes that the issues presented in this matter are novel, and that the undersigned did not find any decisions in this Circuit that directly addressed whether prejudice should be presumed in the circumstances presented here. However, this Circuit has addressed a

[16] Such evidence included testimony regarding the pretrial visits and communication that occurred pretrial; Mr. Gilbert's testimony that he visited Defendant twice (February 11, 2013, after the jury was selected, and February 18, 2013, after six witnesses had presented their testimony); testimony that Ms. Hughes visited Defendant and would relay information to Mr. Gilbert, and the "ojo system" that was created.

similar issue that arose in *Geders* involving a court order that impeded on attorney-client communications.

In *Mudd v. United States*, the defendant appealed a court order that prohibited him from communicating with his counsel about his testimony over a weekend recess. 798 F.2d at 1510. The order at issue was solely limited to the discussion of the defendant's testimony, and the defendant was free to consult with his attorney about "anything else." *Id.* at 1511. This Circuit found that although the order was more limited, its "interference with sixth amendment rights was not significantly diminished." *Id*. at 1512. The Circuit held that the order denied a criminal defendant the right to consult with counsel during a substantial trial recess. *Id*. at 1511. This Circuit further held that the harm caused by the violation required reversal without a showing of actual prejudice. *Id*. This Circuit explained:

> To require a showing of prejudice would not only burden one of the fundamental rights enjoyed by the accused, but also would create an unacceptable risk of infringing on the attorney-client privilege. The only way that a defendant could show prejudice would be to present evidence of what he and counsel discussed, what they were prevented from discussing, and how the order altered the preparation of his defense. Presumably the government would then be free to question defendant and counsel about the discussion that *did* take place, to see if defendant nevertheless received adequate assistance. We cannot accept a rule whereby private discussions between counsel and client could be exposed in order to let the government show that the accused's sixth amendment rights were not violated.

*Id*. at 1513 (internal citations omitted).

In *Pierotti v. Harris*, a judge of the United States District Court for the Eastern District of New York determined that a presumption of prejudice was warranted where trial counsel failed to request reasonable accommodations for a defendant with a hearing impairment. 350 F. Supp. 3d 187, 189 (E.D.N.Y. 2018). In determining that it was appropriate to presume prejudice, that court considered, among other factors, evidence demonstrating the defendant's inability to

communicate with his counsel at defense table. *Id*. at 198. The *Pierotti* court noted that the defendant would have been unable to communicate with counsel at the defense table because whispers were difficult for him to understand. *Id*. The *Pierotti* court held that "it is appropriate to presume prejudice when a defendant is denied the right to consult with counsel." *Id*.

Although the decisions referenced above and the facts that played a part in impeding on the defendant's right to consult and communicate with his attorney are vastly different from the facts presented here, what remains constant is the importance of ensuring that the defendant's ability to communicate with counsel is unimpaired. The undersigned is cognizant of the fact that prejudice is to be presumed in very limited circumstance; however, the undersigned concludes that a presumption of prejudice is appropriate in this case. As this Circuit held in *Mudd*, "[t]he only way that a defendant could show prejudice would be to present evidence of what he and counsel discussed [and] what they were prevented from discussing, and how th[is] . . . altered the preparation of his defense." 798 F.2d at 1513. This Circuit presumed prejudice in *Mudd* where, over a substantial trial recess, the defendant was prevented from consulting with counsel on one issue but was able to communicate about "anything else." In the view of the undersigned, it would be legally incongruent to require Defendant to prove actual prejudice where he has shown that the attorney-client communication during a two-week trial was impeded due to a language barrier, which his counsel made no effort to resolve.

Defendant has shown that he tried to communicate concerns regarding the testimony of various witnesses to counsel, counsel never addressed any of his concerns during the trial, and that counsel was unable to communicate substantive matters in Spanish. During counsel's representation of Defendant, he used an interpreter to assist in communicating; however, counsel failed to retain an interpreter to assist with the in-court communications because, as he stated, "I

wasn't going to talk with Mr. Cano-Flores about significant substantive matters." Tr. 11/27/18 at 108. Thus, the undersigned finds it appropriate to presume prejudice under these facts. *See Cronic*, 466 U.S. at 659 n.25 ("The Court has uniformly found constitutional error without any showing of prejudice when counsel was . . . prevented from assisting the accused during a critical stage of the proceeding."); *Gonzalez v. Phillips*, 195 F. Supp. 2d 893, 901-02 (E.D. Mich. 2001) ("[D]epriving [defendant] of an interpreter places his case closer to *Cronic* than *Strickland* on the continuum of ineffective assistance of counsel claims."); *U.S. ex. Rel. Negron v. State of N.Y.*, 434 F.2d 386, 390 (2nd Cir. 1970) ("[Defendant's] incapacity to respond to specific testimony would inevitably hamper the capacity of his counsel to conduct effective cross-examination.").

**CONCLUSION**

For all of the foregoing reasons, it is, this 6th day of July, 2020,

**RECOMMENDED** that Defendant's § 2255 Motion (ECF Nos. 313, 350) be **GRANTED**, and that his conviction be **VACATED**.

Deborah A. Robinson
Digitally signed by Deborah A. Robinson
Date: 2020.07.06 16:14:30 -04'00'

DEBORAH A. ROBINSON
United States Magistrate Judge

**Within fourteen days, any party may file written objections to this report and recommendation. The objections shall specifically identify the portions of the findings and recommendations to which objection is made and the basis of each such objection. In the absence of timely objections, further review of issues addressed herein may be deemed waived.**