UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:08-CR-57-5 TNM |
| v. | |
| JAIME GONZALEZ-DURAN, also known as "Hummer," | |
| Defendant. | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully requests that this Court sentence the defendant, Jaime Gonzalez-Duran (the "Defendant"), to 420 months in prison on Count One followed by a period of five years of supervised release. The Court should also order the Defendant to forfeit $792,000,000 in drug proceeds. *See* Dkt. No. 694.

The Defendant pleaded guilty on February 28, 2025, to conspiracy to distribute five kilograms or more of cocaine and one thousand kilograms or more of marijuana for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(G), and 963 and 18 U.S.C. § 2. Min. Entry Feb. 28, 2025; Plea Agreement, Dkt. No. 652. Based on the Defendant's history and repeated criminal conduct, including the amount of drugs imported into this country for which he was personally responsible and the violence he oversaw during the course of the conspiracy, a sentence of 420 months is a reasonable sentence.

I.     BACKGROUND

   A.     Brief Factual Summary

The Gulf Cartel was a violent Mexican criminal organization engaged in the manufacture, distribution, and importation of large quantities of cocaine and marijuana into the United States, among other illegal activities. *See* Statement of Facts ("SOF") ¶ 3, Dkt. No. 653; Final Presentence

Report ("PSR") ¶ 27, Dkt. No. 695.  In the late 1990s, the Gulf Cartel recruited an elite group of former Mexican military personnel to join their ranks as security and enforcers.  SOF ¶ 2; PSR ¶ 26.  This group became known as Los Zetas.  *Id*.  The Defendant, born in Mexico, was one of those military members who joined the Zetas and began providing the Gulf Cartel with armed security.  SOF ¶ 6; PSR ¶¶ 30, 116.  As time progressed, the group of former military members became their own cartel called Los Zetas.  Collectively, Los Zetas and the Gulf Cartel called themselves "the Company."  SOF ¶ 3; PSR ¶ 27.  The Company controlled hundreds of miles of Mexican territory along the border of Mexico and the United States.  SOF ¶ 4; PSR ¶ 28.  The Company divided its territory into areas known as "plazas" and assigned a leader, known as a "plaza boss."  *Id*.  The Company transported large cocaine shipments via boats, planes, and motor vehicles from Colombia and Venezuela to Central America, and then to various plazas in Mexico.  *Id*.  The Company also transported large quantities of Mexican-grown marijuana to plazas using motor vehicles.  The Company then transported the shipments of cocaine and marijuana from Mexico to the United States for distribution.  SOF ¶ 5; PSR ¶ 29.

During his membership in Los Zetas, the Defendant was in control, or acted as "plaza boss," in the cities of Matamoros, Miguel Aleman, and Reynosa, where he directed Los Zetas' drug-trafficking activities in those areas.  SOF ¶¶ 6-7; PSR ¶¶ 30-31.  The Defendant, and the other leaders of Los Zetas, ruthlessly controlled their drug trafficking routes and plazas through the threat of violence and the imposition of extreme violence, including kidnappings and murders.  SOF ¶ 13.  The Defendant, on behalf of Los Zetas, also paid bribes to law enforcement to ensure the safety of the drugs moving through areas patrolled by law enforcement.  SOF ¶ 7; PSR ¶ 31.

On or about November 8, 2008, the Mexican government arrested the Defendant for organized crime and kidnapping pursuant to a Mexican arrest warrant.  On October 6, 2015, the

Defendant was served with the provisional arrest warrant for the charges in this case. The Defendant was extradited to the District of Columbia in October 2022.

B.     Procedural History

On March 13, 2008, the Defendant, and ten other co-defendants, were indicted by a grand jury in the District of Colombia for conspiring to distribute five kilograms or more of cocaine and one thousand kilograms or more of marijuana, knowing and intending that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(H), and 963 and 18 U.S.C. § 2 (Count One). Dkt. No. 3. Superseding indictments were returned on June 9, 2009, November 4, 2010, and September 6, 2012. Dkt. Nos. 6, 27, and 61.

On May 9, 2013, a grand jury sitting in the District of Columbia returned and filed a Fourth Superseding Indictment (the "Indictment") against the Defendant and 25 co-defendants expanding the time frame of the conspiracy charged in Count One: conspiracy to manufacture and distribute cocaine and marijuana, intending and knowing that the cocaine and marijuana would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963. Dkt. No. 159.

The Defendant was extradited to the United States on October 20, 2022. He appeared before Magistrate Judge Robin B. Merriweather in the United States District Court for the District of Columbia the next day. Min. Entry, Oct. 21, 2022. The Defendant entered a plea of not guilty to the charges and was ordered detained. *Id*.

On February 28, 2025, the Defendant pled guilty to Count One of the Indictment. Min. Entry, Feb. 28, 2025; Plea Agreement, Dkt. No. 652. The sentencing hearing is scheduled for June 6, 2025. *Id*.

II.    SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

This Court must begin the sentencing proceeding by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). "As a matter of administration

and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id*. at 49.

On May 29, 2025, the U.S. Probation Office issued a final Presentence Investigation Report ("PSR") for the Defendant. Dkt. No. 695. The Guidelines calculations in the PSR (shown below) mirror the parties' calculations in the plea agreement and are correct:

| | | |
|---|---|---|
| 91. | Base Offense Level (U.S.S.G § 2D1.1(a)(5), (c)(1)): | 38 |
| 92. | The Defendant possessed a dangerous weapon, including a firearm (U.S.S.G § 2D1.1(b)(1)): | +2 |
| 93. | The Defendant used violence, made a credible threat of violence and directed the use of violence in connection with the drug conspiracy (U.S.S.G § 2D1.1(b)(2)): | +2 |
| 94. | The Defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense (U.S.S.G § 2D1.1(b)(11)): | +2 |
| 96. | The Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive (U.S.S.G § 3B1.1(a)): | +4 |
| 97. | The Defendant used body armor during the commission of the offense (U.S.S.G § 3B1.5): | +4 |
| | | = |
| 99. | Adjusted Offense Level: | 52 |
| 101. | Acceptance of Responsibility (U.S.S.G § 3E1.1(a) &(b)): | -3 |
| | | = |
| 104. | Total Offense Level: Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43 | 43 |

*Id.* ¶¶ 91-104; Plea Agreement ¶ 3. The PSR also correctly concluded that the Defendant's U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range for Count One is life in prison. *Id.* ¶ 139.

At this time, the Probation Office has not issued a recommended sentence. The Government recommends—based on the terms of the plea agreement—that the Court sentence the Defendant to 420 months' imprisonment.

III.   THE 18 U.S.C. § 3553(A) SENTENCING FACTORS REQUIRE A SENTENCE OF AT LEAST 420 MONTHS IMPRISONMENT

After correctly calculating the advisory Guidelines range, this Court must consider the factors set out in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. Section 3553(a) directs this Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and then "impose a sentence sufficient, but not greater than necessary," to achieve the following purposes:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). While the Court may not presume that the appropriate sentence lies within the correctly calculated Guidelines range, the Court "must begin the[] analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. As this Court is uniquely aware, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions". *Id.* at 46; *see also Rita v. United States*, 551 U.S. 338, 349 (2007). Thus, to the extent this Court

varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  *Id*. at 50.

    A.    <u>Nature and circumstances of the offense, and need for the sentence to reflect the severity of the offense</u>

Over the course of almost a decade, the Defendant served as a leader of a vast and violent drug trafficking operation.  The criminal activity undertaken by the Defendant—from violent kidnappings to pay-offs to corrupt police officers—spans the complete panoply of behavior undertaken by members of transnational drug cartels.  SOF ¶¶ 3, 7; *See* PSR ¶ 111.  The Defendant undertook this violence and corruption to enable himself and his compatriots to move tonnage quantities of cocaine into the United States.  Years of successful cocaine trafficking allowed the Defendant to reach the upper echelons of Los Zetas, ending in his control of Reynosa, the largest and most lucrative plaza held by the cartel.  SOF ¶¶ 5-7.

The Defendant is personally responsible for trafficking tens of thousands of kilograms of cocaine and marijuana during the course of the conspiracy.  The drugs that went through the Reynosa plaza alone in less than a two-year period were worth approximately $792,000,000.  *See* Sent'g Hr'g Tr. at 12, *United States v. Gilberto Lerma-Plata*, No. 11-CR-00238 (D.D.C. Oct. 23, 2013), Dkt. No. 82.  These staggering amounts are exponentially more than the minimum amount of cocaine and marijuana required to trigger the highest possible offense level under the Guidelines.

Los Zetas were incredibly violent and terrorized the citizens of Mexico.  Acts of violence were directed at rival drug trafficking groups during conflicts for control over drug plazas and trafficking routes.  SOF ¶ 13.  Innocent citizens were caught in the middle of Los Zetas' desire to control territory and the drug trade in Mexico.  The Defendant played a central role in this as demonstrated by his storing of rifles, grenades, and explosives.  SOF ¶ 9.  As part of plea, the

Defendant admitted he knew the cartel used the weapons to conduct their drug trafficking and that he participated in the violence. SOF ¶¶ 9, 13. Simply put, Los Zetas, and the Defendant, terrorized the people of Mexico through carrying weapons and engaging in violence to control large swaths of territory in northern Mexico.

The recommended 420-month sentence is sufficient to reflect the seriousness of this offense.

      B.      <u>History and characteristics of the Defendant</u>

The Defendant's history and characteristics also warrant a sentence of 420 months of imprisonment. To begin, the Defendant started his adult life in public service to the people of Mexico and immediately transitioned to perpetrating violence and promoting organized crime. Furthermore, he never worked in a law-abiding capacity after leaving the military at 20 years old. For at least eight years he lived a life of crime with one of the most violent criminal organizations in the world. And by continuing in that life, the Defendant enjoyed the lavish profits of the drug trafficking operation he managed. For instance, between May 2007 and February 2008, more than $6.5 million United States Dollars—the Defendant's drug proceeds—were seized in Texas.

The Defendant was routinely prepared for armed conflict. The Defendant regularly traveled around Mexico while heavily armed. For example, he regularly wore body armor, carried firearms, and possessed grenades, which members of Los Zetas used in rocket-propelled grenade launchers. SOF ¶ 9. Also, when the Defendant was arrested, the authorities located a warehouse in which the Defendant had a "cache of 540 rifles, 165 grenades, 500,000 rounds of ammunition and 14 sticks of TNT." SOF ¶ 9; PSR ¶ 33. This conduct demonstrates the Defendant's complete disregard for the law. It also reflects the absolute impunity he cultivated as a notorious cartel leader.

As noted in the PSR, the Defendant was convicted in Mexico of numerous criminal charges, ranging from kidnapping and stockpiling weapons to money laundering. PSR ¶¶ 111-13. Although the sentences are not calculated to determine the Defendant's criminal history category, the Court can, and should, consider them in fashioning a sentence. U.S.S.G. § 4A1.2(h).

Accordingly, a sentence of 420 months' imprisonment is sufficient and accounts for the Defendant's history and characteristics.

C.   Adequate deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by a given defendant. 18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) (discussing goals of general and specific deterrence).

Given the extreme violence that Los Zetas inflicted upon communities in Mexico and elsewhere, and the voluminous amounts of narcotics introduced into communities in the United States, it is imperative that the Court impose a sentence that deters others. It is extraordinarily difficult to capture cartel leaders—and high-ranking members—and bring them to justice. For example, Joaquin Guzman Loera, also known as "El Chapo," escaped from prison on two occasions prior to his ultimate arrest and extradition to the United States. *See* Sonia Moghe and Maria Santana, *Witness testifies he, El Chapo's wife and sons helped coordinate kingpin's last prison escape,* CNN, Jan. 25, 2019, (Dec. 20, 2022), https://www.cnn.com/2019/01/24/us/el-chapo-escape-wife-sons. This case is therefore an opportunity to deter future criminal conduct by would-be cartel leaders; and only the most stringent sentence will be likely to provide effective deterrence to those who are tempted to follow in the Defendant's footsteps.

The Defendant knowingly and willfully joined a violent drug cartel, despite having served in a law enforcement capacity in the Mexican military. Beyond that, specific deterrence is

particularly important in this case, because the Defendant is only 49 years old and has demonstrated a propensity to choose lawless and dangerous behavior over law-abiding conduct.

A term of 420 months is sufficient to meet the goals of general and specific deterrence.

D. <u>Protect the public from further crimes of the Defendant</u>

The Defendant was able to rise to the top level of Los Zetas because of his success in trafficking cocaine and marijuana, combined with his access to weapons, firearms, and explosives. The Defendant's skill in knowing how to utilize these weapons was honed through military training. Those are resources and skills the Defendant will be able to maintain and cultivate despite incarceration. And, as demonstrated by Ismael "El Mayo" Zambada Garcia, the founding leader of the Sinaloa Cartel, a septuagenarian is fully capable of running a drug cartel. The Defendant's actions demonstrate that if he is ever released and returns to Mexico, he will return to his criminal empire.

The recommended 420-month sentence is sufficient to protect the public from future crimes of the Defendant.

E. <u>Need for sentence imposed to avoid unwarranted sentence disparities among similarly situated defendants</u>

Section 3553(a)(6) addresses "the need to avoid *unwarranted sentence* disparities among defendants with similar records who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added). When determining whether a sentence creates an unwarranted disparity, the Court should consider a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history and whether and to what extent a defendant cooperated. *See, e.g.*, *United States v. Mejia*, 597 F. 3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's

"harsher" sentence was not unwarranted). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to his case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).[1]

As set forth above, the Defendant engaged in drug trafficking activities for almost a decade and conspired to distribute tonnage quantities of cocaine and marijuana into the United States. In arriving at its sentencing recommendation, the Government has evaluated the Defendant's role within the conspiracy and the length and extent of his criminal conduct. The Government's recommendation of a 420-month sentence is consistent with sentences received by defendants engaged in similar conduct and holding similar positions within transnational criminal organizations.

    1.    Jorge Eduardo Costilla-Sanchez

Jorge Eduardo Costilla-Sanchez, one of the founders of the Gulf Cartel, was the organization's eventual leader prior to his arrest. Costilla-Sanchez was a co-conspirator of the Defendant (Gonzalez-Duran). Costilla-Sanchez pled guilty[2] to three counts charged in the

---

[1] Section 3553(a)(6) does not require that the sentencing judge engage in a case-by-case comparison. This sentencing provision is aimed at national disparities; and courts have held that "the guidelines themselves are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *United States v. Saez*, 444 F.3d 15, 18–19 (1st Cir. 2006); *see also United States v. Boscarino,* 437 F.3d 634, 638 (7th Cir. 2006); *United States v. Gallegos,* 129 F.3d 1140, 1143 (10th Cir. 1997); *United States v. Hall,* 977 F.2d 861, 863–64 & n.4 (4th Cir. 1992); *United States v. LaSalle,* 948 F.2d 215, 218 (6th Cir. 1991); *United States v. Joyner,* 924 F.2d 454, 460–61 (2d Cir. 1991).

[2] Costilla-Sanchez was charged in the District of Columbia with conspiring with other members of the Gulf Cartel and Los Zetas to distribute thousands of kilograms of cocaine and marijuana through the border between Mexico and Texas in violation of 21 U.S.C. §§ 959(a), 960, and 963, and the case was later transferred to the Southern District of Texas for disposition. Dkt. No. 1, Case No. 19-CR-00739-1 (S.D. Tex.). The defendant also was charged in the Southern District of Texas with conspiracy to possess with intent to distribute a quantity exceeding 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B) and

Southern District of Texas indictment: one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine and more than one thousand kilograms of marijuana, and two counts of threatening to assault and murder a federal agent. Min. Entry, Sep. 26, 2017, No. 00-CR-00118-S1-006 (S.D. Tex.). He also pled guilty to count one of the District of Columbia indictment, namely conspiracy to distribute five kilograms or more of cocaine and 1,000 kilograms or more of marijuana intending and knowing that the substances would be unlawfully imported into the United States. Min. Entry, Jan. 9, 2020, No. 19-CR-00739-1 (S.D. Tex.). The Court adopted the Guidelines as calculated in the Presentence Investigation Report: a base offense level of 38, a four-level increase for his leadership role in the organization, a two-level increase for possession of a dangerous weapon, a two-level increase for the importation of methamphetamine, and a three-level decrease for acceptance of responsibility. Dkt. No. 44, No. 19-CR-00739-1 (S.D. Tex.). Costilla-Sanchez was in criminal history category I, and the applicable Guidelines range was life imprisonment. *Id*.

Costilla-Sanchez was sentenced to two terms of life imprisonment to run concurrently. Min. Entry, Sep. 15, 2022, No. 19-CR-00739-1 (S.D. Tex.) & No. 00-CR-00118-S1-006 (S.D. Tex.). The conduct for which the defendant was sentenced was based out of the same conspiracy and almost identical to the Defendant (Gonzalez-Duran).

    2.  Alfredo Beltran Leyva

Alfredo Beltran Leyva received a life sentence for his drug trafficking conviction. *United States v. Alfredo Beltran Leyva*, 916 F.3d 14, 20–21 (D.C. Cir. 2019). Similarly to the Defendant, Beltran Leyva and his two brothers ran a large-scale drug trafficking organization ("DTO") called

---

threatening to assault and murder a federal agent, in violation of 18 U.S.C. § 115. Dkt. No. 1, Case No. 00-CR-00118-S1-006 (S.D. Tex.).

the Beltran Leyva Organization, a Mexico-based DTO closely allied with the Sinaloa Cartel until after Beltran Leyva's arrest in 2008. *Id.* at 19. As with Los Zetas, "[t]he DTO's cocaine business purchased cocaine from Colombian manufacturers through brokers and then shipped the drugs via land, air, or water for sale throughout Mexico; the cartel also imported some of that cocaine to the United States . . . ." *Id.* The DTO also "engaged gunmen to kill members of rival cartels." *Id.* Beltran Leyva's base offense level was 38, based upon the quantity of drugs involved. *Id.* at 20. The court found that five enhancements applied, including a four-level enhancement because the defendant was an organizer or leader and two-level enhancements each for possession of a dangerous weapon, violence, bribing a law enforcement official, and the importation of a controlled substance. *Id.* at 20–21. Beltran Leyva's total offense level prior to any acceptance of responsibility was 50, similar to the Defendant's, but unlike the Defendant, Beltran Leyva did not have any reported Mexican convictions, resulting in a criminal history category I.[3] *Id.* at 21. After considering the factors in 18 U.S.C. § 3553, the court found no basis for a downward departure and imposed a life sentence. *Id.*

       3.      Aurelio Cano-Flores

Aurelio Cano-Flores was sentenced to 420 months' imprisonment following a conviction at trial of conspiracy to distribute five kilograms or more of cocaine and one thousand kilograms or more of marijuana for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963. Judgment, Dkt. No. 172, No. 08-CR-00057-16 (D.D.C.). The Government presented evidence that Cano-Flores, a co-defendant of the Defendant (Gonzalez-Duran), operated as a plaza boss in Los Guerra, Mexico. According to testimony at the sentencing hearing, Los

---

[3] Prior to sentencing, Beltran Leyva unsuccessfully attempted to withdraw his guilty plea. *Id.* at 21. The court ultimately held the defendant did not qualify for a downward adjustment for acceptance of responsibility. *Id.*

Guerra was a much smaller plaza than either Reynosa or Miguel Aleman. Sent'g Tr. at 53, No. 08-CR-00057-16 (D.D.C. May 13, 2013), Dkt. No. 183. The defendant had a base offense level of 38 based on drug quantity; a total offense level of 47 after enhancements for leadership, possession of a dangerous weapon, abuse of a position of public or private trust, and direct involvement in the importation of a controlled substance; and a criminal history category of I. *Id*. at 74-76. The court found a sentence of 420 months' imprisonment appropriate for such conduct.

As described above, other conspirators and similarly situated defendants have received comparable sentences to the sentence requested by the Government in this case. A sentence of 420 months' imprisonment will not result in an unwarranted sentencing disparity because the Defendant's criminal culpability matches each of the defendants described above. As in each of these cases, the Defendant was responsible for sending drugs to the United States, the Defendant was a leader and organizer, and the Defendant possessed a weapon. And, as in each of these cases, the Defendant has a total offense level that is higher than forty-three—the highest possible offense level—and thus a Guidelines range of life in prison. The Defendant, much like Costilla-Sanchez and Beltran Leyva, reaped the rewards of climbing to the top of a violent drug trafficking organization, and as such should receive a commensurate sentence.

Imposing a sentence of 420 months' imprisonment will avoid unwarranted sentencing disparities.

## IV.   CONCLUSION

In sum, this Court should impose a sentence of 420 months in prison, which is reasonable and appropriate to the severity of the crimes committed by the Defendant. It is the only sentence that is sufficient, but not greater than necessary, to hold the Defendant accountable for his crimes, to promote respect for the law, to deter the Defendant and others from committing similar serious crimes, and to protect the public. Finally, the Court should order the Defendant to forfeit

$792,000,000. *See* Dkt. No. 694.

                    Respectfully Submitted,

                    MARLON COBAR
                    Chief
                    Narcotic and Dangerous Drug Section
                    Criminal Division
                    U.S. Department of Justice

                    By: */s/ Kirk Handrich*
                    Melanie Alsworth
                    Acting Deputy Chief
                    Kirk Handrich
                    Jayce Born
                    Trial Attorneys
                    Narcotic and Dangerous Drug Section
                    Criminal Division
                    U.S. Department of Justice
                    Washington, D.C. 20530
                    Telephone: (202) 514-0422

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF) system with the United States District Court for the District of Columbia to counsel of record for the Defendant on May 30, 2025.

By: /s/ *Kirk Handrich*
Kirk Handrich
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice